**LANDMARK LAND COMPANY, INC., Plaintiff–Appellant,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellant,**

v.

**United States, Defendant–Cross Appellant.**

Nos. 00–5065, 00–5073 and 00–5074.

United States Court of Appeals, Federal Circuit.

DECIDED: July 24, 2001.

Paul M. Fish, Modrall, Sperling, Roehl Harris & Sisk, P.A., of Albuquerque, NM, argued for plaintiff-appellant. With him on the brief was R.E. Thompson.

John V. Thomas, Associate General Counsel, Federal Deposit Insurance Corporation—Receivership Goodwill, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Richard S. Gill, John M. Dorsey, III, Dorothy A. Doherty, of Washington, DC; and Norman Friedman, Richard S. Falkow, and Richard H. Kamp, of Dallas, TX.

David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Jeanne E. Davidson, Deputy Director; Arlene P. Groner, Glenn Chernigoff, Gary Dernelle, Richard B. Evans, Tom Forgue, Elizabeth Frank, Craig Gottlieb, Joanne Johnson, Delisa Sanchez, Tarek Sawi, and Tonya J. Williams, Trial Attorneys.

Jerry Stouck, Spriggs & Hollingsworth, of Washington, DC, for amicus curiae Plaintiffs' Coordinating Committee.

Before MICHEL, Circuit Judge, ARCHER, Senior Circuit Judge, and SCHALL, Circuit Judge.

MICHEL, Circuit Judge.

This is a *Winstar*-related case. Landmark Land Company ("Landmark") appeals from the judgment of the Court of Federal Claims, which awarded $21.5 million to Landmark for the government's breach of a 1982 contract and $17.7 million to the Federal Deposit Insurance Corporation ("FDIC") for the government's breach of a 1986 contract. The court granted summary judgment on the issue of liability, holding the government liable as to both Landmark's and the FDIC's claims. The court then conducted a bench trial to establish the amount of damages. Landmark argues that its award was inadequate because it failed to fully compensate Landmark for its performance under the contract. The FDIC has also appealed with respect to its award, for essentially the same reason. The government has cross-appealed, arguing that the trial court erred in making any award to Landmark. The government also argues that the FDIC's claims must be dismissed, as they do not satisfy the case-or-controversy requirement because the FDIC and the government are not adverse as to these claims. We heard oral argument by the three parties on May 8, 2001.

Because the trial court properly awarded restitution to Landmark for the entire amount of its net loss that was either required or foreseeable under the contract, we affirm the judgment as to Landmark in all respects. Because the claims raised by the FDIC fail to satisfy the case-or-controversy requirement of Article III of the Constitution, we reverse the trial court's summary judgment of liability as to the FDIC's claims, and remand for the dismissal of the FDIC from the case.

## BACKGROUND

The *Winstar*-related cases involve claims against the government relating to the savings and loan, or "thrift," crisis of the early 1980s. The events that contributed to this crisis, and the government's breach of its contracts with numerous thrifts through the 1989 enactment of the

Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, have been thoroughly discussed in the decisions in the original *Winstar* cases. *See, e.g., United States v. Winstar Corp.*, 518 U.S. 839, 843–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). We find it unnecessary to expand that treatment here. Instead, we will limit our discussion to the specific circumstances relevant to this appeal.

There are more than 120 *Winstar*-related cases currently pending before the Court of Federal Claims. In the interest of efficiency, that court selected five of these *Winstar*-related cases, including the instant case, for the adjudication of issues common to many of the other cases. We have reviewed the court's decisions in two of the other test cases, *Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed.Cir.2001), and *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001). This decision is issuing concurrently with our decision in another of the test cases, *Glass et al. v. United States*, 258 F.3d 1349 (Fed.Cir.2001).

Landmark was a real estate development company with no prior involvement in the savings and loan industry. In 1982, Landmark entered into a contract with the Federal Savings and Loan Insurance Corporation ("FSLIC") to acquire two failing thrifts: Dixie Federal Savings and Loan Association ("Dixie") and Heritage Federal Savings and Loan Association ("Heritage"). This contract is referred to as the Assistance Agreement, and according to its terms, Heritage was merged into Dixie upon Landmark's acquisition of the thrifts.

During the 1980s, the FSLIC encouraged private investors such as Landmark to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors. The primary inducement that the FSLIC offered potential purchasers was a partial forebearance from regulatory capital requirements. The FSLIC accomplished this by allowing the purchaser to treat the thrift's asset shortfall itself as a fictional asset, so that the thrift's assets and liabilities were placed in equipoise at the time of acquisition—at least on paper. For instance, if a thrift had $80 in assets and $100 in liabilities, the FSLIC would allow the thrift's purchaser to allocate the $20 shortfall in real assets to a fictional asset called "supervisory goodwill." The FSLIC would then allow the thrift to include this supervisory goodwill among the assets used to meet regulatory capital maintenance requirements. Because the regulatory goodwill was amortized over a long period, typically forty years as in this case, the thrift's purchaser would have to contribute much less in actual capital to the thrift. This made the thrift far more attractive to potential purchasers, at no cost to the FSLIC.

The Assistance Agreement required Landmark to make an initial contribution to Dixie of "not less than $20,000,000." Landmark did this by contributing real estate and cash valued at $21.5 million. In exchange, the FSLIC agreed to allow Dixie to treat its shortfall in actual assets as supervisory goodwill, which could be applied to Dixie's regulatory capital maintenance requirements. In order to maintain Dixie's financial strength as the value of the goodwill was reduced through amortization, the Assistance Agreement also required Landmark to make additional capital contributions to Dixie as necessary to maintain Dixie's net worth at no less than 3% of its liabilities.

After acquiring Dixie in 1982, Landmark conveyed the balance of its assets to Dixie in 1983. It did so in order to obtain more advantageous tax treatment of the profits that were expected to be made upon the

later sale of those assets. In 1986, the government and Dixie entered into an agreement under which Dixie acquired another thrift, St. Bernard Federal Savings and Loan Association ("St.Bernard"). To accomplish this acquisition, Dixie transferred substantially all of its real estate assets to St. Bernard in 1986 in exchange for stock in St. Bernard. Dixie then merged with St. Bernard in 1989. The merged thrift went bankrupt and was seized by federal regulators and placed into receivership in 1991, with the Resolution Trust Corporation ("RTC") acting as receiver.[1]

Congress enacted FIRREA in August 1989. FIRREA required thrifts to maintain "tangible capital" in an amount not less than 1.5% of the thrift's total assets. 12 U.S.C. § 1464(t)(9)(C) (1994). Tangible capital was defined to exclude supervisory goodwill. *Id.; see also Winstar*, 518 U.S. at 856–57, 116 S.Ct. 2432 (discussing the changes instituted through FIRREA). FIRREA also required thrifts to maintain "core capital" in an amount not less than 3% of the thrift's total assets. FIRREA defined "core capital" to include a limited amount of "qualifying supervisory goodwill." 12 U.S.C. § 1464(t)(1), (2), & (3)(A) (1994). However, even this limited use of supervisory goodwill was subject to an accelerated phase-out schedule under FIRREA. Ultimately, the Supreme Court held that the government breached its contracts with several financial institutions, and their investors, by enacting FIRREA. *Winstar*, 518 U.S. at 843, 116 S.Ct. 2432.

Landmark brought the instant action against the government seeking compensation for the assets that it contributed to Dixie in 1982 and 1983, and "use value" as compensation for Landmark's loss caused by its inability to use those assets after contributing them to Dixie. The Court of Federal Claims granted the FDIC's motion to intervene, as Dixie's successor in interest, with claims to recover Dixie's 1986 contribution to St. Bernard, and the unamortized portion of Dixie's goodwill that had been created by the 1982 Assistance Agreement and subsequently eliminated by FIRREA. *See Plaintiffs in All Winstar–Related Cases At the Court v. United States*, 44 Fed.Cl. 3, 8 (1999). The court granted Landmark's and the FDIC's motions for summary judgment against the government on the issues of liability for breach of the 1982 Assistance Agreement and the 1986 contract under which Dixie acquired St. Bernard. *See Landmark Land Co., Inc. v. United States*, 44 Fed.Cl. 16, 18 (1999). The court then conducted a bench trial to determine damages. The court awarded Landmark $21.5 million for its 1982 contribution under the Assistance Agreement, but denied recovery for lost "use value," concluding that Landmark had failed to adequately prove it. The court also denied recovery for the 1983 capital contribution, concluding that it was not required under the contract and that its loss was not foreseeable by the government. The court awarded the FDIC $17.7 million restitution for the breach of the 1986 contract, but denied its claim for the value of Dixie's lost goodwill on the ground that the FDIC had failed to prove its value.

## DISCUSSION

### I. Landmark's Claims

#### A. The Remedy of Restitution

■ "When the United States enters into contract relations, its rights and

---

1. As receiver, the RTC sold Dixie's litigation claims to RTC operating in its corporate capacity. In 1995, all of RTC's assets and liabilities were transferred by operation of law to the FSLIC Resolution Fund to be managed by the FDIC. Thus, the FDIC appears in this litigation as the successor to the rights of Dixie.

**1372**

duties therein are governed generally by the law applicable to contracts between private individuals." *Winstar,* 518 U.S. at 895, 116 S.Ct. 2432 (internal citation omitted). "[W]hen one party to a contract repudiates that contract, the other party 'is entitled to restitution for any benefit that he has conferred on' the repudiating party 'by way of part performance or reliance.'" *Mobil Oil Exploration, Prod. Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (*citing Restatement (Second) of Contracts § 373* (1979)). Restitution is available to a private party to remedy a contract breach or repudiation by the government. *Id.* at 623–24, 120 S.Ct. 2423.

■ "The idea behind restitution is to restore-that is, to restore the non-breaching party to the position he would have been in had there never been a contract to breach." *Glendale,* 239 F.3d at 1380. Thus, restitution restores to the non-breaching party the net loss that he suffered as a result of his performance under the contract. With respect to the Assistance Agreement, that would be accomplished by awarding Landmark the value of its "property conveyed [under the contract] less the reasonable value of any counter-performance received" by Landmark from the government. John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 15–4, at 651 (3d ed.1987).

### 1. Restitution for Landmark's 1982 contribution under the contract

According to the express terms of the Assistance Agreement, Landmark was required to make an initial contribution "in the amount of not less than $20,000,000 to the Resulting Association [Dixie] as of the Acquisition Date." To satisfy this requirement, Landmark made an initial contribution of real estate and cash. Landmark presented evidence at trial, which the court found persuasive, indicating that the value of this initial contribution was $21,458,571.[2] The trial court awarded Landmark restitution, and alternatively reliance damages, for the full value of its initial contribution.

### a. The measure of restitution

■ There are two alternative measures of relief in restitution. The first is the value of the benefits received by the defendant due to the plaintiff's performance. The second is the cost of the plaintiff's performance, which includes both the value of the benefits provided to the defendant and the plaintiff's other costs incurred as a result of its performance under the contract. *See Acme Process Equip. Co. v. United States,* 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966) ("As the best means of restoring the status quo ante, cost of performance is often used.").

The government argues on its cross-appeal that the trial court's calculation of the award was improper because it was based upon the value of the benefits that the government received from Landmark's performance under the contract. The government argues that, under *Acme,* an award against the government can only be based upon the "cost of performance" standard. We find nothing in *Acme* to support the government's position, and even assuming, arguendo, that this court's predecessor had so held in *Acme,* that holding was overruled by *Mobil Oil.* There, the Court held that the plaintiffs were entitled,

**2.** On appeal, the government has argued that the trial court's award was improper because Landmark failed to prove the value of its initial contribution with specificity. We do not understand this argument, as Landmark's evidence indicated the value with precision, to the single dollar.

under restitution, to repayment of the benefits they conferred upon the government in performance of the contract. *Mobil Oil,* 120 S.Ct. at 2438 ("[T]he Government must give the companies their money back."). In any event, the government's argument is irrelevant with respect to Landmark's initial contribution because the amount of the award would be identical under either standard.

### b. Restitution beyond the minimum required contribution

The government also argues that any award to Landmark should have been limited to $20 million, as that was the minimum initial contribution that would constitute performance under the contract. The trial court rejected this argument, holding that the terms of the contract are unambiguous in that no ceiling was placed on the initial contribution, but rather it was specified to be "not less than" $20 million, and that if the parties had intended for performance to be limited to $20 million they would not have included the phrase "not less than." *Landmark,* 46 Fed.Cl. at 266–67.

■■■ The proper interpretation of a contract is a question of law, which we review *de novo. Exxon Mobil Corp. v. United States,* 244 F.3d 1341, 1353 (Fed. Cir.2001). We agree with the court's interpretation of the Assistance Agreement on this point. The Agreement required Landmark to make *an* initial contribution. Landmark's initial contribution complied with the Agreement's requirement that its value be "not less than $20,000,000." Further, there is nothing in the Agreement to indicate any intent of the parties for that portion of the initial contribution beyond $20 million to be deemed anything other than an undivided part of *the* initial contribution. Because the Agreement's provisions are "clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co., Inc. v. Madigan,* 2 F.3d 389, 392 (Fed.Cir. 1993). Thus, the entirety of Landmark's $21.5 million initial contribution constitutes performance under the Agreement, and the trial court properly refused to limit the award to $20 million.

### c. Offsetting benefits to Landmark

■■■ Because the purpose of restitution is to restore the plaintiff to its status quo ante, the award to the plaintiff must be reduced by the value of any benefits that it received from the defendant under the contract, so that only the actual, or net, loss is compensated. *See Restatement (Second) of Contracts § 384,* cmt. a ("A party who seeks restitution of a benefit that he has conferred on the other party is expected to return what he has received from the other party."). The government argues that the trial court erred in refusing to offset Landmark's award by the $26.3 million in dividends that Landmark received from Dixie prior to the government's 1989 breach of the Agreement. The trial court denied offset based upon its factual finding that the government "did not establish that any benefits that plaintiffs obtained in the form of dividends from Dixie Savings and Loan can be attributed to the government." *Landmark,* Order at 1 (April 5, 2000). We afford the trial court's findings of fact "considerable deference," disturbing them only if they are shown to have been "clearly erroneous." *Hendler v. United States,* 175 F.3d 1374, 1378 (Fed.Cir.1999). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). The government has not shown this finding to be clearly erroneous. The government's ac-

tions were simply not relevant to the dividends, which were generated as a result of Landmark's performance under the contract in managing Dixie. Thus, because the government was not responsible for the dividends paid by Dixie to Landmark, offset would not be proper.

#### d. Use value

■■■ Landmark appeals the trial court's denial of award for the "use value" of the initial contribution from the time of contribution until the government's payment of the judgment. The remedy of restitution may include compensation for lost use value where necessary to restore the plaintiff to its status quo ante by providing compensation "for the use of the subject matter for the period during which [it] was deprived." *Restatement of Restitution § 157(1)*, cmt. a. The trial court denied Landmark's claim for use value because it found Landmark's evidence unconvincing. Specifically, the trial court stated that:

> Landmark did not prove that it lost a specific amount of money from not having the use of the property that it contributed to Dixie in 1982. To award damages under Landmark's use value theories, we would be required to engage in a series of speculative assumptions that are not permitted in these circumstances. We could not establish at trial how Landmark would have profited from use of the parcels of real estate that it contributed to Dixie in 1982. Expert testimony that Landmark offered for this purpose was not convincing, and we were left with the need to engage in improper speculation. For this reason, we must deny Landmark recovery for use value.

*Landmark,* 46 Fed.Cl. at 270. Landmark argues on appeal that, because a plaintiff is not required to prove the exact amount of its loss in order to be entitled to compensation, the trial court improperly denied recovery for use value on the ground that Landmark "did not prove that it lost a specific amount of money." While it is well settled that recovery cannot be denied on the ground that a non-breaching plaintiff failed to prove the amount of its loss with utter precision, the trial court did not deny recovery solely, if at all, on this basis. As quoted above, the trial court found that Landmark's evidence did not even establish *how* it would have profited from use of the initial contribution. On appeal, Landmark has failed to point to any evidence to indicate that the court's finding was clearly erroneous. Instead, Landmark argues that the trial court improperly applied the standard of proof for an award of lost profits. However, Landmark has provided no indication of how the use value would have been anything other than the profits that the initial contribution would have generated outside the contract-which the trial court found that Landmark had failed to prove. Thus, Landmark has failed to show that the denial of an award for use value was improper.

We hold, therefore, that the trial court's award was sufficient restitution. Thus, we need not consider the trial court's alternative award of the same amount as reliance damages.

#### 2. Restitution for Landmark's 1983 contribution to Dixie

In addition to the initial contribution, the Assistance Agreement also required that Landmark make, for a period of five years from the acquisition date, additional contributions to Dixie of cash or real estate as necessary to maintain Dixie's net worth at an amount not less than 3% of total liabilities. This duty was specified in section 3(f) of the Agreement, which states:

> LANDMARK further agrees that, as a continuing condition to the obligations.of

the [FSLIC] to perform any executory duty under this Agreement, (1) LANDMARK, for a five-year period following the Acquisition Date, will contribute such additional capital to ... [DIXIE] at such times and in such amounts as is needed to maintain ... [DIXIE'S] net worth ... at an amount not less than three percent (3%) of ... [DIXIE'S] total liabilities.

Thus, section 3(f) obligated Landmark to make additional contributions only if necessary to maintain Dixie's net worth at not less than 3% of total liabilities. So long as Dixie's net worth was not less than 3% of its total liabilities, Landmark was under no obligation to make additional contributions.

■■ In 1983, Landmark contributed essentially all of its assets to Dixie. The trial court found that Landmark made the 1983 contribution for business reasons unrelated to any duty of performance under the Assistance Agreement. *Landmark*, 46 Fed.Cl. at 269. This finding is well supported by the evidence before the trial court, including a 1983 letter from Landmark's President, Gerald Barton, to Landmark's Board of Directors. In the letter, Barton advocated the contribution of essentially all of Landmark's assets to Dixie because it would significantly increase the net profit on the later sale of the assets. Barton stated that Landmark's assets included a great deal of "understated value, *i.e.,* unrealized profit," and thus—after Landmark contributed the assets to Dixie—"[i]f these assets were sold in Dixie, 40 percent less tax would be paid on that profit." While Barton also indicated that the contribution would improve the financial stability of Dixie by increasing its net worth, he stated that the contribution would increase Dixie's net worth ratio to "above 11 percent," almost four times that required under section 3(f) of the Assistance Agreement.

■ It is undisputed that the Assistance Agreement did not require Landmark to make the additional contribution in 1983. Landmark, however, argues on appeal that since it had the right to make additional contributions under the contract, such an additional contribution qualifies as performance under the contract, entitling Landmark to restitution. The law is well settled, however, that in order to be compensable as restitution, the plaintiff's contribution must have been made in performance of its contractual obligations. *Tangfeldt Wood Prods., Inc. v. United States,* 733 F.2d 1574, 1577 (Fed.Cir.1984) (where the plaintiff "performed the work for its own purposes and convenience ... restitution is not owing"). Landmark argues that a voluntary contribution made in effectuating the spirit of the contract, *i.e.,* managing Dixie responsibly, should be compensated. In each of the cases relied upon by Landmark in support of this argument, however, the plaintiff had discharged another party's unperformed contractual obligations in order to protect its own interests. *See First Nat'l City Bank v. United States,* 212 Ct.Cl. 357, 369, 548 F.2d 928 (1977) ("One who pays another's debt to protect his own rights and interests is not ordinarily considered a volunteer."); *N. Star Alaska Housing Corp. v. United States,* 30 Fed.Cl. 259, 272 (1993) (allowing restitution where plaintiff discharged defendant's obligation which was "expressly set forth in the contract"). Critically then, in both cases, restitution was awarded to compensate the plaintiff for performance of a contractual obligation. In the instant appeal, conversely, Landmark's 1983 contribution did not constitute performance of a contractual obligation. Thus, the decisions cited by Landmark are not applicable.

■ Landmark alternatively argues that the 1983 contribution constitutes per-

formance under the contract because Dixie's net worth would have slipped below 3% of its liabilities sometime in 1985 had the contribution not been made in 1983. Thus, Landmark argues that it is entitled to restitution for the 1983 contribution because it inevitably would have been required under the contract. Whether this is true or not, Landmark has provided no authority for the proposition that a party's action, which did not constitute performance of a contractual obligation at the time of the act, can later be transformed into the performance of a contractual obligation when the condition precedent to that party's contractual duty occurs *after* the act. A volunteer cannot later be deemed to have acted pursuant to a duty that did not exist at the time of the act. By definition, if a contractual duty is subject to a condition *precedent,* that condition must be satisfied *before* the duty arises.

Landmark also argues that the 1983 contribution should be deemed required performance under section 17 of the Assistance Agreement, entitled "continuing cooperation."[3] Landmark argues that because it was subject to this best efforts clause, its 1983 contribution cannot be deemed "voluntary." The trial court rejected this argument, based upon its determination that "this section establishes nothing more than a general obligation on the part of the parties to cooperate with one another." *Landmark,* 46 Fed. Cl. at 269. Landmark relies upon *Lebanon Chemical Corp. v. United States,* 5 Cl.Ct. 812 (1984), for support. *Lebanon* is clearly distinguishable, however. In a settlement agreement with the government, Lebanon agreed to retrieve its recently-banned pesticides from its customers and

transport them to disposal sites which the government agreed to designate by a specified date. *Id.* at 816. Because the government failed to designate the disposal sites by the specified date, the plaintiff incurred expenses for temporarily storing the pesticides until the government performed. Although the settlement agreement did not address storage costs, the court allowed recovery because the costs were incurred as a direct result of Lebanon's performance in satisfaction of its duty under the contract to put forth its best efforts to achieve the stated result of transporting the pesticides to the government within the allotted time. *Id.* at 817. Thus, the court allowed recovery in *Lebanon* on the basis of the best efforts clause where the contract was otherwise silent as to whether the plaintiff's actions were required under the contract.

Here, however, the Assistance Agreement is not silent on that point. Section 3(f) expressly provides the sole condition under which Landmark was required to make additional contributions, and it is undisputed that this condition did not obtain in 1983. It is well established that when interpreting a contract, a specific provision will dominate a general provision. *See, e.g., Hills Materials Co. v. Rice,* 982 F.2d 514, 517 (Fed.Cir.1992) ("Where specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language."). Thus, because the express language of section 3(f) provides that Landmark was not under a duty to make the 1983 contribution, the general duty to cooperate contained in section 17

---

**3.** The relevant language of section 17 states: It is the purpose of this Agreement to provide a means by which the failure of ... [DIXIE] may be prevented ... and ... [DIXIE] may be provided with property development and loan portfolio opportuni- ties.... The parties, therefore, agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein.

cannot be interpreted to create such a duty.

Finally, Landmark argues that the 1983 contribution constitutes performance under the Assistance Agreement because it was made in response to the concerns of federal regulators about conflicts of interest between Dixie and Landmark's other subsidiaries. Landmark's President, Gerald Barton, testified before the trial court that federal regulators had informed Dixie that a conflict of interest would exist so long as Landmark was pursuing property development activity both within, and independently from, Dixie. The alleged concern was that Landmark would retain the most attractive real estate investments for itself, while funneling less attractive investments to Dixie.

■ The trial court found that Landmark had not made the 1983 contribution because of the regulators' concerns about conflicts of interest. Even if Landmark could show that this finding of fact was clearly erroneous, however, the error would have been harmless. Landmark provided no evidence that it was *obligated* to contribute its real estate assets to Dixie. There was no evidence that the regulators directed Landmark as to how the conflicts of interest should be eliminated. Landmark was always free to eliminate any concerns about conflicts of interest by simply selling its real estate assets to a third party.[4]

Since the 1983 contribution was not required under the contract, it does not constitute performance of a contractual obligation, and therefore the trial court correctly denied restitution.

### 3. Restitution for Dixie's 1986 contribution to St. Bernard

■ The trial court awarded the FDIC, as Dixie's successor in interest, $17.7 million in restitution for the contribution Dixie made to St. Bernard in 1986. On appeal, Landmark argues that this restitution award should have been made to it, not to the FDIC, because the assets contributed by Dixie to St. Bernard were previously owned by Landmark. Landmark did not seek restitution at trial in connection with the 1986 transaction between Dixie, the government, and St. Bernard. Thus, this issue does not appear to be properly before us on appeal. *See, e.g., Braun, Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 821 (Fed.Cir.1992) ("In view of Waring's unexplained failure to raise the issue before the district court, we see no reason to depart from the general rule that issues may not be raised for the first time on appeal."). In any event, Landmark's argument is not persuasive. During Dixie's existence, it and Landmark were always separate corporations. Landmark contributed assets to Dixie in 1982 in exchange for stock in Dixie. At that point Landmark no longer owned the assets, Dixie did. In 1986, Dixie contributed the assets to St. Bernard. Thus, the only party with a possible claim against the government is Dixie, not Landmark. To allow Landmark recovery would be to dis-

---

4. Landmark has also appealed from the trial court's refusal, upon Landmark's motion submitted after the court's decision, to re-open the record and allow the submission of a federal regulator's affidavit. The affidavit states only that the government had indeed informed Landmark of its concerns about conflicts of interest. Critically, the affidavit contains no indication that the government required Landmark to eliminate any conflict by making the 1983 contribution. Further, the affidavit provides no indication that Landmark was unable to eliminate any concerns over conflicts by selling its real estate assets to a third party. Thus, even if the trial court's decision had been an abuse of discretion, it would have been harmless.

regard the separate corporate existence of Landmark and Dixie. Landmark has provided no reason, let alone any basis in precedent, for this court to reverse the trial court for having failed to do so, especially since Landmark did not request such relief at trial.[5]

## B. The Remedy of Reliance Damages

 Landmark also appeals the trial court's denial of compensation for the 1983 contribution under a theory of reliance damages. The purpose of reliance damages is to compensate the plaintiff "for loss caused by reliance on the contract." *Restatement (Second) of Contracts § 344(b)*. In order to be recoverable as reliance damages, however, plaintiff's loss must have been foreseeable to the party in breach at the time of contract formation. *See Restatement (Second) of Contracts § 351(1)* ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made."). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Restatement (Second) of Contracts § 351(2)*. In order to be entitled to reliance damages, a plaintiff must prove that both the magnitude and type of damages were foreseeable. *See* 5 Arthur Corbin, *Corbin on Contracts, § 1012 at 88 (1964)* ("[In order to have

been foreseeable] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach."); *see also Restatement (Second) of Contracts, § 351,* cmt. a ("The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable.").

The trial court found that the 1983 contribution was not foreseeable. The 1983 contribution was comprised of $3.3 million worth of real estate, and 100% of the stock of Unique Golf Concepts, Inc., a subsidiary of Landmark with substantial real estate assets and a value of approximately $31.5 million. The trial court did not distinguish between the real estate and stock components of the 1983 contribution in finding that the entire contribution was not reasonably foreseeable. Further, in its principal brief on appeal, Landmark states that "[t]here is no valid theoretical distinction between the $3 million [real estate] contribution or the 1983 [stock] contribution." Thus, we will review the trial court's finding that the 1983 contribution as a whole was not foreseeable, without considering whether the real estate or stock components of that contribution, considered separately, would have been foreseeable.

 In finding that the 1983 contribution was not foreseeable, the trial court stated:

The government was aware that Landmark was in the property development business, but it had no reason to foresee

---

**5.** Landmark also argues that it is entitled to restitution for the 1986 contribution by Dixie to St. Bernard under the restitutionary principle of "tracing," by which compensation is made to one whose property has been wrongfully conveyed to another. *See Restatement of Restitution,* Ch. 13 at 816 (1937) (tracing principles are normally applied "[w]here property in which one person has a beneficial interest, whether legal or equitable, is wrong-

fully conveyed by another to a third person, and the wrongdoer receives from the third person other property in exchange therefor"). Here, tracing principles are inapplicable both because Landmark no longer had any beneficial interest in the property when it was conveyed to St. Bernard by Dixie, and because it cannot be claimed that Dixie's conveyance was improper.

that Landmark would contribute essentially all of its assets to Dixie. It could not foresee at the time of contracting that a breach of the Assistance Agreement would cause Landmark to lose its entire business.

*Landmark,* 46 Fed. Cl. at 270. Foreseeability is a question of fact. *Climatic Rainwear Co., Inc. v. United States,* 115 Ct. Cl. 520, 533, 88 F.Supp. 415 (1950). Landmark argues that its contribution was foreseeable because section 17 of the Assistance Agreement provides that "[i]t is the purpose of this Agreement to provide a means by which ... [Dixie] may be provided with property development and loan opportunities." Further, Landmark points to a letter sent prior to contract formation from Landmark's counsel to the government's representative. In this letter, Landmark stated that:

> As we discussed, it is probable that, from time to time, Landmark will contribute additional real estate to [Dixie], whether it needs additional net worth or not. In this regard, we understand that there would be no limit to the amount of real estate that could be contributed to [Dixie] for capital purposes.

While the letter indicates that the government was on notice that Landmark intended to possibly contribute real estate to Dixie beyond that required under the contract, it fails to provide any indication of the certainty or magnitude of any additional contribution. In the letter, Landmark

did assert its understanding that "there would be no limit to the amount of real estate that could be contributed," but this provides no insight into the actual magnitude of the additional contribution Landmark might make. The issue of foreseeability is admittedly close in this case. However, we are not left with the "definite and firm conviction" that the magnitude of the 1983 contribution was foreseeable at the time of contract formation. *United States Gypsum Co.,* 333 U.S. at 395, 68 S.Ct. 525. Thus, Landmark has failed to show that the trial court's finding that the 1983 contribution was not foreseeable was clearly erroneous. Thus, we will not disturb the trial court's denial of reliance damages.

## II. Standing of the FDIC

The FDIC, as successor in interest to the defunct Dixie, intervened in this case in order to assert Dixie's claims in the amounts of $641.9 million for its 1986 contributions to St. Bernard, and $32.3 million for the unamortized portion of Dixie's goodwill that had been created by the 1982 Assistance Agreement and then eliminated by FIRREA. The court awarded the FDIC $17.7 million in restitution for the breach of the 1986 contract because it found that to be the value of the benefit that Dixie had provided to the government. The court denied the FDIC's goodwill claim, finding that the FDIC had failed to prove the value of the lost goodwill.[6]

---

**6.** Unlike FDIC, Landmark did not seek compensation for the full value of the goodwill that Dixie lost due to the government's breach. On appeal, however, Landmark points to the trial court's award of restitution to FDIC for the full value of St. Bernard's lost goodwill as proof that it is entitled to restitution for the full value of the. goodwill that Dixie lost due to FIRREA. As Landmark did not make such a claim at trial, and has failed to provide any explanation for its failure to do so, we will not consider it on appeal. *Braun,* 975 F.2d at 821. We do note, however, that

after the trial court's decision in this case, we vacated an award of restitution for the full amount of the supervisory goodwill lost due to FIRREA in *Glendale,* 239 F.3d at 1381. We vacated the award in *Glendale* because the plaintiff had put forth no evidence to establish the actual value of the lost goodwill, instead arguing that goodwill was equivalent to cash. *Id.* While we did not doubt that supervisory goodwill had some value, we held that where the plaintiff has not adduced evidence of that value, there is no basis for an

■ Even if the FDIC were to have won a judgment for the entire amount it was seeking, however, none of the money paid by the government in satisfaction of such a judgment would leave the government. That is because the government holds a claim against Dixie for an even greater amount paid by the RTC to Dixie's depositors upon Dixie's liquidation. Nor would adjudication of the FDIC's claims affect Dixie's other creditors. For these reasons, the FDIC's claims do not give rise to an actual case or controversy because the FDIC and the government are not truly adverse as to the FDIC's claims. Therefore, the FDIC lacks standing, and its claims must be dismissed.

■ "Article III, § 2 of the Constitution confines federal courts to the decision of 'Cases' or 'Controversies.'" *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (vacating judgment and remanding for dismissal of plaintiffs' claims because the case-or-controversy requirement had not been satisfied). "Standing to sue or defend is an aspect of the case-or-controversy requirement." *Id.* In order for a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect "the legal relations of parties having adverse legal interests." *Aetna Life Ins. v. Haworth,* 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). The case-or-controversy requirement has not been satisfied because the FDIC is not adverse to the United States as to these particular claims.

■ Standing must · exist at all stages of judicial proceedings, and we must determine the FDIC's standing anew on appeal. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78, 110 S.Ct. 1249,

108 L.Ed.2d 400 (1990) (court must dismiss a suit as soon as the case/controversy is extinguished, even if a justiciable dispute existed when the complaint was first filed). Here, at no time were the FDIC and the United States truly adverse parties. Because the case-or-controversy requirement is a component of subject matter jurisdiction, it cannot be waived by the parties. *See, e.g., Sosna v. Iowa,* 419 U.S. 393, 398, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ("While the parties may be permitted to waive nonjurisdictional defects, they may not by stipulation invoke the judicial power of the United States in litigation which does not present an actual 'case or controversy.'"). Thus, the failure of the government to assert the FDIC's lack of standing before the trial court is immaterial. Further, it is understandable that the trial court did not address this issue because there is no indication that the government raised it prior to its cross-appeal to this court. It also does not appear that the trial court was made aware of the circumstances by which the government's payment of a judgment to the FDIC would never leave the government, as discussed below.

The trial court issued a consolidated decision and order granting the FDIC's motion to intervene in 36 *Winstar*-related cases, including the instant case. The court granted intervention because the FDIC, as the failed thrifts' successor in interest, had the authority to bring suit on behalf of the thrifts, and was obligated by statute to pay out the proceeds of any judgment to the thrifts' creditors, which included private-party creditors. *See Plaintiffs in All Winstar–Related Cases at the Court v. United States,* 44 Fed. Cl. 3, 5–6, 8 (1999) ("[S]tatutory provisions establish that the FDIC, as receiver .·.. holds legal title to the assets (including

---

award. *Id.* Thus, we vacated the award and remanded the case for the court to determine

the value of the goodwill.

claims) formerly owned by the failed thrifts and that *any recovery ... must be distributed [to the failed thrifts creditors] pursuant to the statutory order of priorities.*" (emphasis added)). The court's consolidated decision discusses the standing of the FDIC to bring claims against the government in general terms. The Court of Federal Claims has never addressed the standing of the FDIC to bring the specific claims at issue in this case.

It is undisputed that no private creditors could benefit even if the FDIC were to fully recover on its claims in this case. That is because, under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund ("FRF"), against Dixie before distributing any proceeds to Dixie's other creditors. *See* 12 U.S.C. § 1821(d)(11) (1994). It is undisputed that Dixie owes the FRF over $1.5 billion for the advances that the FRF made to Dixie's depositors upon its liquidation. The claims asserted by the FDIC in this case total only $674.2 million. Thus, even if the FDIC were to fully recover, all proceeds from the judgment would be paid out of the FRF, and then distributed by the FDIC right back into the FRF. Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot affect any party other than the government.

The FDIC argues that the case-or-controversy requirement is satisfied because it maintains two distinct funds within the FRF, and that a judgment would be paid out of one fund and into the other. Upon Congress' abolishment of the FSLIC, it created the FRF to receive and manage the assets of the former FSLIC. 12 U.S.C. § 1821a. When the RTC was abolished in 1995, its assets and liabilities were also transferred to the FRF. 12 U.S.C. § 1441a(m). Although not required to do

so, the FDIC, as manager of the FRF, has maintained the two sets of assets and liabilities in two distinct funds, FRF–FSLIC and FRF–RTC. 61 Fed.Reg. 45,970, 45,-971–73 (Aug. 30, 1996). Thus, because the FDIC is asserting Dixie's claim against the government—an asset of the FRF–RTC—any recovery will be paid into the FRF–RTC fund. Because the FSLIC was the governmental party to the alleged contract under which the FDIC has brought suit, the damages claim is an FSLIC liability, and any recovery will be paid out of the FRF–FSLIC fund. 12 U.S.C. § 1821a(d). Thus, the net effect is that the government would satisfy any judgment by simply transferring funds from FRF–FSLIC into FRF–RTC.

The existence of two distinct funds within the FRF could be relevant if depletion of one of the funds would either prevent third-party creditors from recovering on claims against the FRF, or increase the total amount of the government's liability. The FDIC, however, has not shown this to be the case. The Treasury is responsible for funding the FRF. The Secretary of the Treasury is required to disburse funds to the FRF as necessary to satisfy its liabilities. 12 U.S.C. § 1821a(c). If a surplus is generated within the FRF, then the Treasury would be the beneficiary. 12 U.S.C. § 1821a(f). Thus, even if the FRF–FSLIC fund were drained of all assets due to payment of damages for claims brought by the FDIC in the numerous *Winstar*-related cases, the government remains obligated to fully fund the FRF. Because the FRF will always be funded, recovery by the FDIC cannot prevent, or even affect, recovery by third-party creditors with claims against the FRF. Likewise, since Treasury would benefit from a surplus within the FRF–RTC, the FDIC has failed to show how transferring funds from FRF–FSLIC to FRF–RTC will have any net effect upon the government or any third-party. We hold, therefore, that upon

the facts presented in this case, the FDIC has not established that its claims satisfy the justiciability requirements of Article III, § 2, because it has not shown that it and the government are adverse as to these claims.

It must be clearly stated that we are not holding that all claims by the FDIC against the government will fail to satisfy the case-or-controversy requirement. Rather, we hold that, in this case, where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied.

The fact that the FDIC's claims do not present an actual case or controversy does not, however, necessarily lead to the conclusion that we must dismiss the FDIC's claims. The FDIC intervened in this case. Whether an intervening party must satisfy the case-or-controversy requirement independently of the claims brought by the other plaintiffs is an open question. *See Diamond v. Charles,* 476 U.S. 54, 68–69, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) ("We need not decide today whether a party seeking to intervene before a District Court must satisfy not only the requirements of [Federal] Rule [of Civil Procedure] 24(a)(2), but also the requirements of Art. III."). We conclude, however, that because the FDIC's claims are unrelated to those brought by Landmark, it would be improper to permit the FDIC to proceed given the lack of a justiciable controversy with respect to its claims.

The FDIC's claims raised upon intervention are unrelated to those brought by the original plaintiff, Landmark. Landmark's claims are distinct from those brought by the FDIC, and have been adjudicated without regard to them. Fully resolving Landmark's claims will not affect the resolution of the FDIC's claims. Because the actual controversy presented in this case—Landmark's claims—may be fully adjudicated without regard to the FDIC's claims, adjudication of the FDIC's claims would not be in accordance with the case-or-controversy requirement. Thus, the summary judgment of liability as to the FDIC's claims must be reversed, the damages judgment vacated as to the FDIC, and the case remanded for the trial court to dismiss the FDIC from the case.

## CONCLUSION

We affirm the trial court's award of restitution to Landmark for its initial contribution under the Assistance Agreement. We reverse the grant of summary judgment holding the government liable to the FDIC, and vacate the damages judgment as to the FDIC, because its claims do not satisfy the case-or-controversy requirement. We remand for the trial court to dismiss the FDIC from the case.

*AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART,* and *REMANDED.*

## COSTS

Each party to bear its own costs.