FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Successor to the Rights
of KARNES COUNTY SAVINGS AND
LOAN ASSOCIATION, Plaintiff,

and

Quincy Lee and Steven Lee, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91–993C.

United States Court of Federal Claims.

Filed: May 29, 2002.

Stephen C. Zachary, Federal Deposit Insurance Corporation, Dallas, Texas, for plaintiff FDIC.

John C. Millian, Gibson, Dunn & Crutcher, Washington, D.C., for plaintiffs Quincy Lee and Steven Lee.

Scott D. Austin, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

HODGES, Judge.

This is related to the *Winstar* line of cases. Plaintiffs Steven Q. Lee and Quincy Lee invested $4.1 million in the New Karnes County Savings and Loan Association. The bank eventually failed, and the Lees sued the Government for breach of contract. Plaintiff FDIC sued as receiver for Karnes County Savings and Loan. The Lees do not have privity of contract with the United States. The FDIC's complaint does not present a "case-or-controversy."

## I. BACKGROUND

Federal regulation of the thrift industry was the primary responsibility of the Federal Home Loan Bank Board prior to the enactment of the Financial Institutions Reform, Recovery and Enforcement Act of 1989. 12 U.S.C. § 1464 (1982). The Federal Savings and Loan Insurance Corporation administered a fund that insured deposits held by thrift institutions. 12 U.S.C. §§ 1725, 1726 (1982). The Federal Home Loan Bank Board established regulations governing their financial standards and activities. 12 C.F.R. §§ 500–599 (1987).

The Karnes County Savings and Loan Association was financially troubled in the early 1980s. The Lee plaintiffs bought the institu-

tion for $4.1 million in 1987, including $1.25 million paid to previous shareholders. Karnes' president and CEO asked for certain regulatory forbearances from the Federal Home Loan Bank in connection with the acquisition, which was completed in June 1987.

Soon thereafter, a routine regulatory examination uncovered a number of problems with Karnes' operations. These included improper additions to its goodwill account, failure to maintain books and records in a manner consistent with sound banking practices, lack of written policies and procedures required by regulations and by prudent banking practices, and failure to meet projections set forth in Karnes' business plan. Karnes was facing insolvency.

The Federal Home Loan Bank Board determined that Karnes was being operated in an unsafe and unsound manner and recommended that a receiver be appointed. Karnes' Board of Directors terminated all management personnel or allowed them to resign. The Board itself resigned in September 1989. The Texas Commissioner of Savings and Loans appointed a state conservator to supervise Karnes in October, and the Office of Thrift Supervision appointed the Resolution Trust Corporation as receiver in January 1990.

Shareholder plaintiffs complain that they relied to their detriment on the forbearances that defendant offered when they acquired Karnes. Also, certain actions taken by the regulators and the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–75,103 Stat. 183 (1989), breached their contract with the Government. We are not satisfied that Karnes had a contract with the United States, but the Lees do not have privity in any event and the FDIC does not have standing to sue.

## II. DISCUSSION

### A. FDIC

■ Plaintiff FDIC's case is controlled by *Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed.Cir.2001) and *Glass v. United States*, 258 F.3d 1349 (Fed.Cir.2001). Both cases hold that arguments similar to FDIC's here do not present a "case-or-controversy" as required by Article III, § 2 of the United States Constitution. For a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect "the legal relations of parties having adverse legal interests." *Landmark*, 256 F.3d at 1380 (quoting *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).

FDIC intervened to bring suit on behalf of the thrift and to pay the proceeds of any judgments to the thrift's creditors. *See Plaintiffs in All Winstar–Related Cases at Court v. United States*, 44 Fed.Cl. 3, 6 (1999) ("[S]tatutory provisions establish that FDIC, as receiver ..., holds legal title to the assets ... formerly owned by the failed thrifts and that any recovery ... must be distributed [to the failed thrifts' creditors] pursuant to the statutory order of priorities.").

FDIC's claim for damages as receiver in this case is less than $3 million. The FSLIC Resolution Fund holds a claim of more than $21 million against the receivership. 12 U.S.C. § 1821(d)(11) lists the distribution priority of creditors in such circumstances. The receiver's administrative expenses are paid ahead of all other claims. After paying administrative and litigation expenses, FDIC is required by statute to repay the FSLIC Resolution Fund, up to $21 million. 12 U.S.C. § 1821(d)(11)(A)(i) (1988 and Supp. II 1990). FDIC must repay the entire amount that the Fund paid to insured depositors before it could make distributions to uninsured depositors or to general creditors. 12 U.S.C. § 1821(d)(11)(A) (1988 and Supp. II 1990).[1]

---

1. 12 U.S.C. § 1821(d)(11) Distribution of assets.
   (A) Subrogated claims; claims of uninsured depositors and other creditors. The receiver shall—
   (i) retain for the account of the Corporation such portion of the amounts realized from any liquidation as the Corporation may be entitled to receive in connection with the subrogation of the claims of depositors; and
   (ii) pay to depositors and other creditors the net amounts available for distribution to them.
   (B) Distribution to shareholders of amounts remaining after payment of all other claims and expenses. In any case in which funds remain

FDIC argues that it has standing because six uninsured depositors will receive pro rata shares of any damages that the court might award to FDIC as receiver. Though it briefed this result based on 12 U.S.C. § 1821(g),[2] FDIC now relies on its Depositor Priority regulations found at 12 C.F.R. § 360.3 (1994).[3]

This section of the Code of Federal Regulations supports FDIC's position that the Insurance Fund shares pro rata with uninsured depositors. Though 12 U.S.C. § 1821(d)(11) seems to require at subsection (A)(i) that the Fund be paid in full, FDIC counsel points out that the statute does not say that the Government must be paid *first*. The FDIC interprets the statute to permit everyone in the same category to be paid at the same time and to share pro rata in the proceeds. The Agency notes that it has interpreted 12 U.S.C. § 1821(d)(11) in this manner for at least 70 years, and that its interpretation is entitled to *Chevron* deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

If FDIC argued this regulation to the Federal Circuit in *Glass* or *Landmark* as it has here, that court did not agree:

> The FDIC contends that any damages award will be distributed to the creditors . . . and this, the FDIC argues, renders its claim justiciable. We disagree. While any net recovery by the FDIC would be distributed to creditors under the statutory scheme applicable to the [receivership] in this case [the Insurance Fund] *has priority over all other creditors under this statutory scheme.* 12 U.S.C. § 1821(d)(11).

*Glass v. United States*, 258 F.3d 1349, 1355 (Fed.Cir.2001) (emphasis added) (citation in original).

after all depositors, creditors, other claimants, and administrative expenses are paid, the receiver shall distribute such funds to the depository institution's shareholders or members together with the accounting report required under paragraph (15)(B).

**2.** 12 U.S.C. § 1821(g) Subrogation of Corporation.

(1) In general. Notwithstanding any other provision of Federal law, the law of any State, or the constitution of any State, the Corporation, upon the payment to any depositor . . . shall be subrogated to all rights of the depositor against such institution or branch to the extent of such payment or assumption.

(2) Dividends on subrogated amounts. The subrogation of the Corporation under paragraph (1) with respect to any insured depository institution shall include the right on the part of the Corporation to receive the same dividends from the proceeds of the assets of such institution and recoveries on account of stockholders' liability as would have been payable to the depositor on a claim for the insured deposit, but such depositor shall retain such claim for any uninsured or unassumed portion of the deposit.

**3.** 12 C.F.R. § 360.3(a) Unsecured claims against an association or the receiver that are proved to the satisfaction of the receiver shall have priority in the following order:

(1) Administrative expenses of the receiver, including the costs, expenses, and debts of the receiver;

(2) Administrative expenses of the association . . .;

(3) Claims for wages and salaries, including vacation and sick leave pay and contributions to employee benefit plans, earned prior to the appointment of the receiver by an employee of the association whom the receiver determines it is in the best interests of the receivership to engage or retain for a reasonable period of time;

(4) If authorized by the receiver, claims for wages and salaries, including vacation and sick leave pay and contributions to employee benefits plans, earned prior to the appointment of the receiver, up to a maximum of three thousand dollars ($3,000) per person, by an employee of the association not engaged or retained pursuant to a determination by the receiver pursuant to the third category above;

(5) Claims of governmental units for unpaid taxes, other than Federal income taxes, . . .;

(6) Claims for withdrawable accounts, including those of the Corporation as subrogee or transferee, and all other claims which have accrued and become unconditionally fixed on or before the date of default, . . .;

(7) Claims other than those that have accrued and become unconditionally fixed on or before the date of default, . . .;

(8) Claims of the United States for unpaid Federal income taxes;

(9) Claims that have been subordinated in whole or in part to general creditor claims, which shall be given the priority specified in the written instruments that evidence such claims; and

(10) Claims by holders of nonwithdrawable accounts, including stock, which shall have priority within this paragraph (a)(10) in accordance with the terms of the written instruments that evidence such claims.

The Federal Circuit considers 12 U.S.C. § 1821(d)(11) to be a "priority statute." Section (d)(11) is captioned, "Distribution of assets." The semi-colon between "Subrogated claims" and "claims of uninsured depositors and other creditors" in subsection (A) suggests that the former is intended to be considered separately from the latter. "Subrogated claims" in this instance refers to amounts that FDIC might collect from outside parties, potentially including the Government itself.

(A) Subrogated claims; claims of uninsured depositors and other creditors

The receiver shall—

(i) retain for the account for the Corporation such portion of the amounts realized from any liquidation as the Corporation may be entitled to receive in connection with the subrogation of the claims of depositors; and

(ii) pay to depositors and other creditors the net amounts available for distribution to them.

12 U.S.C. § 1821(d)(11)(A) (1994).

FDIC argued in *Glass* that any damage award would be distributed to creditors of the failed thrift and that possibility rendered its claim justiciable. *Glass*, 258 F.3d at 1355. The Federal Circuit found that such recovery by FDIC would be distributed according to the priority established by the statutory scheme applicable to the receivership, and that the FSLIC Resolution Fund had priority over all other creditors. *Id.* at 1356. If the FDIC were to receive all of the $3 million that it seeks in this case, that money would go back into the Insurance Fund. The amount of the subrogated claim is $21 million. As in *Glass*, FDIC's claim here does not affect any party other than the Government.

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed.Cir.2001), reached the same conclusion.

It is undisputed that no private creditors could benefit even if the FDIC were to fully recover on its claims in this case. That is because, under the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government . . . before distributing any proceeds to . . . other creditors.

*Id.* at 1381.

Even if the FDIC were to have won a judgment for the entire amount it was seeking, however, none of the money paid by the government in satisfaction of such a judgment would leave the government. . . . Nor would adjudication of the FDIC's claims affect . . . other creditors . . . FDIC's claims do not give rise to an actual case or controversy because the FDIC and the government are not truly adverse as to the FDIC's claims. Therefore, the FDIC lacks standing, and its claims must be dismissed.

*Id.* at 1380. As in *Glass*, the Federal Circuit cited § 1821(d)(11) in holding that pursuant to "the statutory scheme of priority for thrift creditors, the FDIC is obligated to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund . . . before distributing any proceeds to . . . other creditors. *See* 12 U.S.C. § 1821(d)(11) (1994)." *Landmark*, 256 F.3d at 1365.

Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot affect any party other than the Government. . . . [W]e hold that, in this case, where the *FDIC has not asserted claims in excess of what the failed thrift owes to the Government*, the case-or-controversy requirement is not satisfied.

*Id.* at 1382 (emphasis added).

FDIC argues that *Glass* and *Landmark* did not have uninsured depositors who could share pro rata with the Fund. In this case, there are six such depositors with claims totaling in the range of $300 to $1500. While it is true that those cases did not have uninsured depositors that we know of, the Circuit in *Glass* cited § 1821(d)(11) for the proposition that the Fund "has priority over all other creditors under this statutory scheme." *Glass*, 258 F.3d at 1355. Citing the same statute in *Landmark*, the Circuit held that "the FDIC is obligated to completely satisfy the claim of the Government, specifically that of the FSLIC resolution fund . . . before distributing any proceeds to . . . other creditors." *Landmark*, 256 F.3d at 1381.

FDIC does not seem to be sure that funds available for distribution will cover even the low end of the $300 to $1500 range of claims from uninsured depositors. An affidavit submitted by FDIC's Division of Finance accounting manager in Dallas includes the following:

> The claims of the Uninsured Depositors and the Subrogated Claim are of equal priority and are paid by the receivership at the same time on a pro rata basis. Dividends on the pending claims have been paid to the Uninsured Depositors as well as on the Subrogated Claim, and *if* there is a subsequent distribution to Priority 6 claimants in this receivership, the Subrogated Claim will share on a pro rata basis with the claims of the Uninsured Depositors. (Emphasis added).

We cannot see a meaningful distinction between this case and those discussed earlier in which the Federal Circuit found no case-or-controversy. The most FDIC can be awarded in this case is $3 million; the Insurance Fund has paid depositors $21 million. Any award here would be moved from one government agency to another.

### B. The Lees

The Court of Federal Claims has jurisdiction over claims based on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1) (1994). An action pursuant to the Tucker Act based on a contract "must be between the plaintiff and the government...." *Ransom v. United States*, 900 F.2d 242, 244 (Fed.Cir.1990). The "government consents to be sued only by those with whom it has privity of contract." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir.1999) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed.Cir. 1984)).

When this suit was filed, plaintiffs were Karnes County Savings Association, Steven Q. Lee, and Quincy Lee. FDIC entered the case later "as Successor to the Rights of Karnes." The Lees are not acting

as Karnes but as separate shareholder plaintiffs. Generally, a shareholder does not have standing to bring a direct breach of contract claim. *See e.g., First Hartford*, 194 F.3d at 1289 (shareholders had no privity with United States because bank signed contract with FDIC, not its shareholders).

The Federal Circuit has explained that exceptions to the rules on privity such as pass-through subcontractor suits and Miller Act sureties have a "common thread" that unites them. That is, "the party standing outside of privity by contractual obligation stands in the shoes of a party within privity. A shareholder lacks any such contractual obligation." *First Hartford*, 194 F.3d at 1289.[4]

The Lees were not parties to the contract between Karnes and the United States. The documents that they rely on to allege a contract are letters to government regulators from Karnes, a "New Association." The letters were from the CEO of Karnes, who stated repeatedly that he was acting on behalf on the New Association. The letters did not include mention of the Lees.

The Lees argue that an application to the Texas Savings and Loan Commissioner that they signed made them parties to the contract between Karnes and the United States. The amended complaint refers to that as an application to incorporate a "New Association" into which the "Old Karnes" would be merged. An application to state authorities to incorporate a new association does not create privity with the United States.

The amended complaint acknowledges that the exchange of correspondence concerning the forbearances was between FHLB–Dallas and Karnes. The parties involved knew that the forbearances were matters to be resolved by the new association and FHLB. The Lees apparently did not want to make themselves parties to the forbearances.

If a contract exists in this case, it was created by an exchange of correspondence between Mr. Dulfilho in his capacity as president and CEO of the New Karnes Associa-

---

4. The court added, "[i]ndeed, one of the principal motivations behind utilizing the corporate form is often the desire to limit the risk of owner-ship to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation." *Id.*

tion and FHLB–Dallas, as the Lees acknowledge. The correspondence states, "The New Association has entered into an agreement with Karnes County with respect to an acquisition and recapitalization of Karnes County by the New Association and its principals, Quincy Lee, Steven Q. Lee, and Stephen M. Dulfilho." The letters sent to the Government and cited in the complaint as being a part of the contract were written by Mr. Stephen Dulfilho in his capacity as president of the New Association.

The Lees contributed $4.1 million to the New Association, including $1.25 million that they paid to former shareholders. They argue that the court should look at the "entire deal" and consider them to be direct parties because of their investment. Karnes was created solely to facilitate the transaction, they assert, and the Lees were a "driving force" in the deal. Karnes would have failed without the participation of private investors. None of these factors creates privity, however. The Lees urge us to consider that they seek only restitution, but privity of contract is not determined by the nature of the remedy in these circumstances.

An internal government memo refers to the Lees as purchasers, but this does not demonstrate privity either. And it does not matter that the Lees provided consideration for the purchase. Many deals are structured with money from sources other than the contracting parties. No one would argue that lenders or venture capitalists, for example, necessarily are parties to contracts that they finance. The Lees provided consideration, but the benefits and alleged promises flowed to Karnes through its president and CEO. It may be true that the "government wanted the $4.1 million from Lee" as they argue, but that would have no bearing on whether the Lees are parties to the alleged contract.

Cases have found shareholders to be proper parties in *Winstar*-type breach issues. If the shareholders were signatories to an assistance agreement, for example, they might be parties. *See e.g., Hansen Bancorp, Inc. v. United States,* 49 Fed.Cl. 168, 173 (Fed.Cl. 2001) (shareholders signed one of three documents that comprised the contract). The

Lees did not sign any of the letters that they allege to be the Karnes contract.

The shareholder of Home Savings was allowed to sue the Government as a direct party. *Home Savings of America, F.S.B., and H.F. Ahmanson & Co. v. United States,* 51 Fed.Cl. 487 (2002). Home Savings was a wholly-owned subsidiary of plaintiff Ahmanson & Company, which was a holding company that sought to acquire several banks by merging them into Home Savings. The court's determination that Ahmanson was a proper party was based in part on specific factual findings that are not present here. For example, the holding company committed to maintain the net worth of Home Savings after the mergers. Ahmanson had negotiated directly with the regulators to acquire the target banks through Home Savings. *Id.* at 498–99. The Government's promise that the bank could continue to use goodwill ran directly to plaintiff "in connection with the underlying acquisition." *Id.* at 498.

FHLBB resolutions in *Home Savings* explicitly recognized plaintiff Ahmanson & Company as the applicant for acquisition of the target banks through its subsidiary, Home Savings. The court found that Ahmanson's application to obtain control of the target banks by merging them into Home Savings was the offer and the Board's resolutions containing conditions applicable to Ahmanson was the acceptance that created a contract.

Plaintiff was the "applicant" in that case. It filed a net worth maintenance stipulation and made other promises to the Board that it would operate Home Savings with sufficient capital to comply with net worth requirements. "Ahmanson does not merely have shareholder standing. It was an essential participant in each of these acquisition transactions.... FHLBB negotiated with Ahmanson, which sought to get approval of acquisition of the target banks. And it was Ahmanson that FHLBB recognized as obligating itself ... to maintain Home Savings' net worth." *Home Savings,* 51 Fed.Cl. at 499. None of these determinative factors occurred in this case.

*Bluebonnet Savings* also involved a holding company. *Bluebonnet Savings Bank, F.S.B. v. United States,* 43 Fed.Cl. 69 (1999), *rev'd* 266 F.3d 1348 (Fed.Cir.2001). The investor did not sign the assistance agreement, but the court found that Mr. Fail had privity with the Government by virtue of his ownership of the acquiring holding company's stock. Fail was directly and intimately involved in the negotiations with FHLBB for Bluebonnet. The negotiations lasted for several weeks and the regulators addressed their forbearance letters to him.[5]

In *Home Savings* the investor-shareholder was an acquiring holding company. The shareholder in *Bluebonnet* was the owner of stock in an acquiring holding company. The Government treated both as applicants and negotiated with them directly. The Lees do not approach the level of involvement found in these and other cases in which shareholders have been allowed to sue as direct parties.

The Lees have abandoned their third-party beneficiary claims apparently. The *Glass* case makes it clear that they would not have qualified in any event. *Glass v. United States,* 258 F.3d 1349 (Fed.Cir.2001). The *Glass* court noted that third-party beneficiary status is an "exceptional privilege," and to qualify a party "must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Id.* at 1354 (citations omitted).

### III. CONCLUSION

The FDIC lacks standing to sue the United States because the facts related to its case do not present a "case-or-controversy." The Lees do not have privity of contract with the United States according to the allegations of their complaint, and we cannot grant them relief. Defendant's motions are GRANTED. The Clerk will dismiss both complaints. No costs.

---

**5.** The Federal Circuit remanded *Bluebonnet* for the trial court to reconsider damages. If the standing issue was argued on appeal, it was not addressed in the Circuit's opinion.