**FEDERAL DEPOSIT INSURANCE CORPORATION, As Successor to the Rights of Karnes County Savings and Loan Association, Plaintiff–Appellant,**

and

**Quincy Lee and Steven Lee, Plaintiffs–Appellants,**

v.

**UNITED STATES, Defendant–Appellee.**

**Nos. 02–5159, 02–5162.**

United States Court of Appeals, Federal Circuit.

Sept. 4, 2003.

John V. Thomas, Associate General Counsel, FDIC Legal Division, of Washington, DC, argued for plaintiff-appellant Federal Deposit Insurance Corporation, as Successor to the Rights of Karnes County Savings and Loan Association. With him on the brief were Jon A. Stewart, of Washington, DC; and Stephen C. Zachary, and Ellis Merritt, Jr., FDIC Legal Division, of Dallas, TX. Of counsel were John M. Dorsey, III and Dorothy A. Doherty, FDIC, of Washington, DC.

Paul Blankenstein, Gibson, Dunn & Crutcher LLP, of Washington, DC, argued for plaintiffs-appellants Quincy Lee and Steven Lee. With him on the brief was John C. Millian.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Daniel D. McClain and David D. Zimmerman, Trial Attorneys.

Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This is a *Winstar* related case, growing out of the failure of a federally-insured savings and loan association that resulted from the enactment of a federal statute that barred such institution (also known as a "thrift") from using an accounting method that the federal regulatory agency for the thrift had authorized it to use. The Court of Federal Claims dismissed a damage suit by stockholders of the failed thrift based on the government's alleged breach of a contract authorizing the thrift to use the accounting method. *Fed. Deposit Ins. Corp. & Lee v. United States,* 52 Fed.Cl. 503 (2003). The court held that the shareholders were not parties to, or third-party beneficiaries of, any contract between the United States and the thrift.

The Federal Deposit Insurance Company ("FDIC"), which was the receiver for the failed thrift, was a substituted plaintiff in the stockholder's suit. The Court of Federal Claims dismissed the FDIC as a party, because any recovery it might obtain on behalf of the thrift would have to be paid to the government agency that insured the thrift's depositors; there was accordingly no case or controversy between the FDIC and the United States. *Id.*

We affirm both of those rulings.

## I

A. The *Winstar* related cases developed from the 1980s savings and loan association crisis. The facts relating to that crisis have been frequently stated. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1986); *see also Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.,* 256 F.3d 1365 (Fed.Cir.2001); *Glass v. United States,* 258 F.3d 1349 (Fed.Cir.2001). We shall not repeat them in detail.

In brief, a large number of thrifts were in serious financial difficulties in the early 1980s. At that time, the Federal Home Loan Bank Board ("Board") regulated the industry. "The Federal Savings and Loan Insurance Corporation ['Insurance Corporation'] administered a fund ['Insurance Fund'] that insured deposits held by thrift institutions." *Fed. Deposit Ins. Corp. & Lee*, 52 Fed. Cl. at 503 (citing 12 U.S.C. §§ 1725, 1726 (1982)). The FDIC manages that Fund. *Glass*, 258 F.3d at 1352.

The federal regulators were concerned that if a large number of thrifts became insolvent, the amount in the Insurance Fund might be exhausted and might not be sufficient to pay all of those institutions' depositors. To deal with the problem, the regulators undertook a program of encouraging financially healthy thrifts and individuals to take over the failing thrifts and infuse new capital into them. To make such action attractive, the regulators developed a program that would permit, for regulatory purposes, the failing thrifts to include on their balance sheets a "fictional asset," *Landmark*, 256 F.3d at 1370, called "supervisory goodwill," that represented the excess of the thrift's liabilities over its assets. The regulators further permitted this "asset" to be depreciated over a substantial number of years.

In 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act ("Financial Reform Act"), which made significant changes in the regulation of the thrift industry. *See Winstar*, 518 U.S. at 856, 116 S.Ct. 2432. Of particular significance here, the statute prohibited the use of "supervisory goodwill" as a balance sheet asset for regulatory purposes. 12 U.S.C. § 1464(t) (1994). As a result, a large number of thrifts that theretofore had been in compliance with regulatory capital requirements no longer met those standards, and were forced into receivership. The result was the large number of *Winstar* cases brought by such thrifts and their shareholders against the United States.

B. The appellants Steven Q. Lee and Quincy Lee (the "Lees") decided to participate in this program by acquiring and investing new capital into the Karnes County Savings and Loan Association ("Karnes"), a financially-troubled thrift. The Lees acquired Karnes for $4.1 million. The acquisition took the form of the creation of a new "interim charter" for a thrift, followed by its merger into Karnes. The Board authorized Karnes to use "supervisory goodwill" and stated that "changes in applicable regulation [would] not alter the forbearances granted or that equivalent forbearances [would] be granted thereunder...."

These arrangements were negotiated on behalf of the "New Association" by Stephen Dufilho, the president and CEO of Karnes. The Lees did not sign or draft any of the documents that reflected these arrangements.

Following the enactment of the Financial Reform Act, which precluded Karnes from using supervisory goodwill to meet regulatory requirements, the Board determined that Karnes was being operated in an unsafe manner, recommended that a receiver be appointed, and closed the institution. 52 Fed. Cl. at 504. A state conservator was appointed. *Id.* By statute, the FDIC succeeded as receiver. *See* 12 U.S.C. § 1821(d)(2)(A)(I), (B)(ii). The Insurance Fund paid the claims of Karnes' depositors and was subrogated to their claims against Karnes. *Id.* § 1821(d)(11).

The Lees filed in the Court of Federal Claims the present suit for damages against the United States. In their first amended complaint, they asserted claims for breach of contract and a Fifth Amendment taking. The FDIC filed a complaint as "Substituted Plaintiff, as successor to

the rights of Karnes County Savings and Loan Association," seeking damages for the United States' breach of its alleged contract with Karnes.

The Court of Federal Claims dismissed both complaints. 52 Fed.Cl. at 503. The court stated that it was "not satisfied" that a contract had been formed. *Id.* at 504. It then held that even if there were a contract, the Lees were neither parties to nor third-party beneficiaries of such a contract, and thus lacked standing to assert the breach-of-contract claim. *Id.* at 508–09.

The court also dismissed the FDIC's complaint. Relying on *Landmark,* 256 F.3d 1365, and *Glass,* 258 F.3d 1349, the court ruled that the statute that the FDIC invoked, 12 U.S.C. § 1821(d)(11) (1998 & Supp. II 1990), is a "priority statute" that requires the FDIC before paying depositors, to distribute any recovery it might obtain to the Insurance Fund until the Fund had been fully reimbursed for the amounts it had paid to insured depositors. 52 Fed. Cl. at 505–06. The court held that there was no case or controversy because "[t]he most FDIC can be awarded in this case is $3 million; the Insurance Fund has paid depositors $21 million. Any award here would be moved from one government agency to another." *Id.* at 507.

## II

The FDIC, as receiver of Karnes, seeks to assert against the United States Karnes' claims for damages resulting from the United States' breach of its alleged contract with Karnes to permit the thrift to use "supervisory goodwill." In rejecting this claim, the Court of Federal Claims held that because the FDIC would be required to pay to the Insurance Fund whatever amount it could recover on that claim, there was no case or controversy between the FDIC and the United States. "In order for a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect the legal relations of parties having adverse legal interests." *Landmark,* 256 F.3d at 1380 (citation and internal quotation marks omitted).

We dealt with a virtually identical situation in *Landmark.* There, Landmark had acquired Dixie Federal Savings and Loans Association ("Dixie") and another failing thrift, and the Board authorized Dixie to use "supervisory goodwill." *Id.* at 1370. After Dixie became insolvent, Landmark sued the United States in the Court of Federal Claims for breach of contract. *Id.* at 1371. FDIC intervened as a plaintiff and asserted another breach of contract claim. *Id.* The trial court held for both plaintiffs. *Id.*

We reversed the judgment in favor of the FDIC because its claim did not present any case or controversy between it and the United States. We explained:

> Even if the FDIC were to have won a judgment for the entire amount it was seeking, however, none of the money paid by the government in satisfaction of such a judgment would leave the government. That is because the government holds a claim against Dixie for an even greater amount paid by the RTC [Resolution Trust Corporation] to Dixie's depositors upon Dixie's liquidation. Nor would adjudication of the FDIC's claims affect Dixie's other creditors. For these reasons, the FDIC's claims do not give rise to an actual case or controversy because the FDIC and the government are not truly adverse as to the FDIC's claims. Therefore, the FDIC lacks standing, and its claims must be dismissed.

*Id.* at 1380.

We further explained:

> [U]nder the statutory scheme of priority for thrift creditors, the FDIC is obligat-

ed to completely satisfy the claim of the government, specifically that of the FSLIC Resolution Fund ("FRF"), against Dixie before distributing any proceeds to Dixie's other creditors. *See* 12 U.S.C. § 1821(d)(11) (1994). It is undisputed that Dixie owes the FRF over $1.5 billion for the advances that the FRF made to Dixie's depositors upon its liquidation. The claims asserted by the FDIC in this case total only $674.2 million. Thus, even if the FDIC were to fully recover, all proceeds from the judgment would be paid out of the FRF, and then distributed by the FDIC right back into the FRF. Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot affect any party other than the government.

*Id.* at 1381.

We then stated: "[W]e hold that, in this case, where the FDIC has not asserted claims for recovery in excess of what the failed thrift owes to the government, the case-or-controversy requirement is not satisfied." *Id.* at 1382.

In *Glass,* decided the same day as *Landmark* and involving a similar situation, we also held that because there was no likelihood that any recovery by the FDIC could exceed the amount the Insurance Corporation had paid to the failed thrift depositors, "the FDIC has not asserted a justiciable claim. The FDIC has not demonstrated how the transfer of money from one government fund to another creates a justiciable controversy." 256 F.3d at 1366.

In holding that the FDIC's claim in this case did not create a case or controversy between it and the United States, the Court of Federal Claims correctly stated: "If the FDIC were to receive all of the $3 million that it seeks in this case, that money would go back into the Insurance Fund. The amount of the subrogated claim is $21 million. As in *Glass,* FDIC's claim here

does not affect any party other than the Government." 52 Fed.Cl. at 506.

■ The FDIC contends, however, that the present case is distinguishable from *Landmark* and *Glass* because here, unlike in those cases, there were uninsured depositors who would participate in any of FDIC's recovery from the United States. According to the FDIC, there are six uninsured depositors of Karnes whose claims are estimated to total between $300 and $1,600. The FDIC contends that "section 1821(d)(11) does not establish priorities among creditors," that the governing statute is 12 U.S.C. § 1821(g) and that that section requires it to pay those depositors a pro rata portion of any recovery it obtains on behalf of Karnes. Accordingly, it asserts, the entire amount of the recovery would not go to the Insurance Fund and there is a case or controversy between it and the United States.

We rejected the first prong of the FDIC's theory in *Glass,* where we stated: "in this case" the Insurance Fund "has priority over all other creditors under this statutory scheme. 12 U.S.C. § 1821(d)(11)." 258 F.3d at 1355–56, *amended by* 273 F.3d 1072 (Fed.Cir.2001). As the Court of Federal Claims here ruled: "After paying administrative and litigation expenses, FDIC is required by statute to repay the [Insurance Fund] ... the entire amount that the Fund paid to insured depositors before it could make distributions to uninsured depositors or to general creditors." 52 Fed.Cl. at 504 (citing 12 U.S.C. § 1821(d)(11)(A)(I) (1988 & Supp. II 1990)).

In any event, FDIC's statutory arguments are not persuasive. Section 1821(d)(11), the statutory provision governing the distribution of the assets of a thrift in receivership, provided in 1990:

(11) Distribution of assets

(A) Subrogated claims; claims of uninsured depositors and other creditors

The receiver shall—

(i) retain for the account of the Corporation such portion of the amounts realized from any liquidation as the Corporation may be entitled to receive in connection with the subrogation of the claims of depositors; and

(ii) pay to depositors and other creditors the net amounts available for distribution to them.

Under this statute, the Insurance Fund, a subrogated claimant, must be made whole before the claims of uninsured depositors and other creditors are paid. *Admiral Fin. Corp. v. United States,* 329 F.3d 1372, 1375 (Fed.Cir.2003). As the Court of Federal Claims pointed out: "Section (d)(11) is captioned, 'Distribution of assets.' The semi-colon between 'Subrogated claims' and 'claims of uninsured depositors and other creditors' in subsection (A) suggests that the former is intended to be considered separately from the later." 52 Fed.Cl. at 506. In context, the "net amounts available for distribution to" depositors means any amounts remaining after the subrogated claims have been paid.

Section 1821(g) does not establish priorities among creditors. It provides:

(g) Subrogation of Corporation.

(1) In general

Notwithstanding any other provision of Federal law, ... the Corporation, upon the payment to any depositor ... shall be subrogated to all rights of the depositor against such institution or branch to the extent of such payment or assumption.

(2) Dividends on subrogated amounts

The subrogation of the Corporation under paragraph (1) with respect to any insured depository institution shall include the right on the part of the Corporation to receive the same dividends from the proceeds of the assets of such institution and recoveries on account of stockholders' liability as would have been payable to the depositor on a claim for the insured deposit, but such depositor shall retain such claim for any insured or unassumed portion of the deposit.

12 U.S.C. § 1821(g) (2000).

Under section 1821(g), the Insurance Fund is subrogated to the rights of an insured depositor to the extent that the Fund made an insurance payment on that deposit. A depositor, whose deposit is not fully insured, retains a claim against the thrift receivership for the "uninsured or unassumed portion of the deposit." Section 1821(g)(2) thus merely specifies to what interest the Insurance Fund is subrogated; it does not determine priorities of distribution.

Indeed, this court implicitly rejected the FDIC's argument in *Glass,* when it ruled that the Insurance Fund "has priority over all other creditors under this statutory scheme. 12 U.S.C. § 1821(d)(11)." 258 F.3d at 1355–56. The basic rationale of *Landmark* and *Glass*—that under 12 U.S.C. § 1821(d)(11) the FDIC must reimburse the Insurance Fund for the amounts the Fund paid to the depositors, and that there is no case or controversy where the amount to be so paid to the Fund exceeds the FDIC's maximum possible recovery— is inconsistent with the FDIC's theory in the present case that a portion of such recovery is payable to the uninsured depositors. The FDIC's argument rests primarily upon its theory that § 1821(d)(11) is not a priority statute—a contention we have rejected. The claims of uninsured depositors do not create a case or controversy between the FDIC and the United States.

The FDIC also relies upon its regulation, 12 C.F.R. § 360.3, which embodies its interpretation of the statutory provisions.

Since that interpretation is inconsistent with those provisions, it is not entitled to any deference. *Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1425 (Fed.Cir.1988) (quoting *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 32, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981)).

### III

█ A. The Lees contend that they were parties to a contract between Karnes and the United States and that they therefore can sue for breach thereof. The Court of Federal Claims correctly rejected that contention.

There was no formal express written contract between Karnes and the Board authorizing Karnes to use "supervisory goodwill." The arrangements so providing were set forth in written communications between Karnes and the Board, in which the latter authorized Karnes to use such accounting.

The letters requesting that Karnes be authorized to do so were all signed by Mr. Dufilho as the president of the thrift and stated that the "New Association" was making the request. Dufilho submitted a declaration "in support of" the Lees' motion for summary judgment stating that "the Lees and I requested that the government grant certain capital and regulatory 'forbearances' that would allow us the opportunity to return Karnes to profitability over a period of years. These requests were set forth in a letter to FHLB–Dallas dated November 11, 1986." That letter, however, made no reference to the Lees and was signed by Dufilho as "President" of "New Karnes County Savings and Loan Association (In Organization)." Thus, the actual request was made solely by Dufilho, not jointly by him and the Lees.

Other letters from New Karnes to the Board similarly were signed only by Dufilho as president of that entity. The letters from the Board dealing with the arrange-

ment were addressed to Dufilho, not to the Lees. The Lees did not personally participate in the negotiation of these arrangements or in the drafting of the letters in which Karnes negotiated them.

█ To be sure, the regulators undoubtedly were aware that the Lees were supplying the money that would be used to rehabilitate Karnes. Neither that knowledge, the supplying of the new capital, or the Lees' position as stockholders in Karnes, made them parties to those arrangements. A shareholder generally does not have standing to assert a breach of contract claim on behalf of the corporation. *First Hartford Corp. v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999).

In sum, assuming without deciding that the arrangements between Karnes and the regulators constituted a contract to permit Karnes to use "supervisory goodwill," the Court of Federal Claims correctly ruled that the Lees were not parties to such a contract.

█ B. The Lees further contend that even if they were not parties to any contract between Karnes and the United States, they were third party beneficiaries of the contract and entitled to sue for its breach. They are not third party beneficiaries merely because the contract would benefit them. RESTATEMENT (SECOND) OF CONTRACTS § 315 (1981). "In order to create rights in a third party, the contract must reflect the express or implied intention of the parties to benefit the third party." *US Ecology, Inc. v. United States,* 245 F.3d 1352, 1356 (Fed.Cir.2001) (citation and internal quotation marks omitted). "Third party beneficiary status is an 'exceptional privilege' and, to avail oneself of this exception privilege, a party must 'at least show that [the contract] was intended for his direct benefit.'" *Glass,* 258 F.3d at 1354 (citing *German Alliance Ins. Co. v.*

*Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912)).

In *Glass,* we held that shareholders of a thrift were not third-party beneficiaries because there was no evidence that the parties to the alleged contract intended to benefit directly the investors, who only stood to benefit indirectly, as shareholders. 258 F.3d at 1355; *see also Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697–98 (1980). Subsequently, we stated that *Glass* held that shareholders seeking to sue as third-party beneficiaries must "demonstrate that the contract ... reflects an intention to benefit the party *directly.*" *Castle v. United States,* 301 F.3d 1328, 1338 (Fed.Cir.2002) (citation and internal quotation marks omitted).

Like the shareholders in *Glass* and *Castle,* the Lees have not shown that the arrangements between Karnes and the Board were intended to benefit them "directly." As in *Castle,* "[u]nder the alleged contract, every promise the government failed to keep in the wake of FIRREA [Financial Reform Act] pertains to the regulatory treatment of [Karnes]." *Id.* The arrangement provided accounting benefits for Karnes and any benefits the Lees obtained from it was the result solely of their being stockholders in that company. Such indirect benefit is insufficient to make them third party beneficiaries of a contract.

C. Finally, the Lees contend that they are entitled to just compensation because the United States took their property by prohibiting the use of "supervisory goodwill" several years after the Board authorized it for Karnes. Although they correctly "recognize that in *Castle,* this Court held that no takings claim was available to similarly situated plaintiffs," they contend that that holding was erroneous and should be overruled. This panel, however, is bound by *Castle* and cannot overrule it. *Newell Cos., Inc. v. Kenney Mfg. Co.,* 864

F.2d 757, 765 (Fed.Cir.1988). The Lees' taking claim fails.

## CONCLUSION

The judgment of the Court of Federal Claims dismissing the complaints is

*AFFIRMED.*