**FIRST COMMERCE CORPORATION, Plaintiff–Appellant,**

**and**

**FDIC, Federal Deposit Insurance Corporation, and First Commerce Savings Bank, Plaintiffs,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–5183.

United States Court of Appeals, Federal Circuit.

July 16, 2003.

Rosemary Stewart, Spriggs & Hollingsworth, of Washington, DC, argued for plaintiff-appellant.

John J. Hoffman, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart E. Schiffer, Deputy Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Jordan A. Thomas, Trial At-

torney. Of counsel was John N. Kane, Jr., Attorney.

Before NEWMAN, CLEVENGER and SCHALL, Circuit Judges.

CLEVENGER, Circuit Judge.

In this *Winstar* case, First Commerce Corporation appeals the decision of the United States Court of Federal Claims, which held on summary judgment that First Commerce had not entered into a contract with the United States for favorable regulatory accounting treatment in exchange for First Commerce's acquisition of Mutual Federal Savings Bank of Lowell, Indiana, a failing thrift. *First Commerce Corp. v. United States*, 53 Fed. Cl. 38 (2002). The Court of Federal Claims held that a discrepancy between the terms of First Commerce's request for favorable accounting treatment and the forbearances actually granted by the government precluded the formation of a contract between First Commerce and the United States. We hold that while the Court of Federal Claims correctly discerned a discrepancy between offer and acceptance in this transaction, the court's analysis was incomplete because it did not consider the possibility that the government made a counteroffer. We conclude that the government made a counteroffer to First Commerce, and we vacate the decision of the Court of Federal Claims and remand for further proceedings.

## I

Appellant First Commerce Corporation was organized in 1987 by a group of individual investors in Indiana, for the purpose of acquiring a financially troubled thrift. According to First Commerce, the Federal Home Loan Bank Board ("FHLBB"), acting primarily through its office located at the Federal Home Loan Bank of Indianapolis, told First Commerce that favorable regulatory treatment could be extended to investors acquiring failing thrifts, and provided First Commerce with the names of candidate thrift institutions. First Commerce selected Mutual Federal, which was close to insolvency but not actually insolvent.

In June 1987, First Commerce submitted an eight-page bid letter to the FHLB of Indianapolis. The bid letter proposed that First Commerce acquire Mutual Federal, infusing about $1.2 million in new capital into the merged thrift. The bid letter stated that "[a]ny excess of Mutual's fair-valued liabilities over its fair-valued tangible and identified intangible assets would be 'capitalized' as an unidentified intangible asset"—which is to say that the merged thrift could, via purchase method accounting, record supervisory goodwill [1]

---

1. When the purchase method is used to account for a merger, any excess of the purchase price over the fair value of the thrift's net assets is recorded as goodwill. Prior to the restrictions imposed by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (FIRREA), merged thrifts were permitted to count such goodwill as capital for purposes of meeting regulatory minimum capital requirements. Goodwill arising from mergers of troubled thrifts was termed "su-

pervisory goodwill." *See United States v. Winstar Corp.*, 518 U.S. 839, 848–49, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); 12 C.F.R. § 567.1 (2003). Permitting the use of supervisory goodwill to satisfy minimum capital requirements, and allowing the merged thrifts to amortize supervisory goodwill over extended periods, were typically the inducements offered by the government to persuade healthy institutions to assume the liabilities of troubled thrifts. *See Winstar*, 518 U.S. at 844–58, 116 S.Ct. 2432.

as an intangible asset arising from the acquisition. The bid letter further requested that Federal Savings and Loan Insurance Corporation ("FSLIC") grant the merged thrift a regulatory forbearance, permitting First Commerce to use non-GAAP (generally accepted accounting principles) amortization in accounting for the supervisory goodwill arising from the acquisition. In particular, First Commerce requested permission to amortize the goodwill over 25 years via the straight line method:

1. *Amortization of Intangibles.* The FSLIC shall agree that, notwithstanding generally accepted accounting principles, for regulatory accounting purposes, the value of any intangible assets resulting from accounting for the merger of First Commerce into Mutual in accordance with the purchase method may be amortized by the Resulting Institution over a period of 25 years using the straight line method.

According to First Commerce, officials of the FHLB of Indianapolis informed First Commerce that its bid was the best received for Mutual Federal. In November 1987, First Commerce filed with the FSLIC a formal application to acquire the outstanding stock of Mutual Federal. The application stated the following:

Consummation of the Acquisition by the Holding Company pursuant to the Purchase Agreement is conditioned upon the granting by the FHLBB and the FSLIC of certain regulatory forbearances and approvals in connection with the Acquisition and the subsequent operation of the Institution.... These forbearances, waivers and approvals, which Applicants hereby request, are as follows:

1. *Purchase Accounting; Amortization of Intangibles.*

For purposes of reporting to the FHLBB, with respect to the books and records of the Institution, the FHLBB shall agree that purchase accounting shall be used to record the purchase of the Institution's capital stock, and the FHLBB shall agree that the value of any intangible asset resulting from the application of purchase accounting may be amortized by the Institution using the level yield method over the lives of the related assets giving rise to such intangible asset.

Thus, in contrast to the bid letter, First Commerce's formal application did not request 25–year straight line amortization of goodwill. Rather, it requested conventional GAAP treatment: level yield amortization "over the lives of the related assets." Although the precise implications of the difference between the two accounting treatments are disputed by the parties, it suffices for our purposes to state that GAAP treatment would amortize the goodwill over a period shorter than 25 years, because the "related assets" were Mutual's outstanding loans, and that newly merged thrifts generally sought longer (non-GAAP) amortization to improve their apparent profitability. *See United States v. Winstar Corp.,* 518 U.S. 839, 851–53, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *First Commerce,* 53 Fed Cl. at 44 n. 11, 45 n. 13.

The formal application also included a business plan for the reorganized thrift, prepared by the same consulting group that prepared First Commerce's bid. Like the forbearance request, First Commerce's business plan described level yield amortization of the goodwill over the lives of the assets and made no reference to an

extended 25–year amortization term. Concurrently with First Commerce's application, Mutual Federal submitted an application for voluntary supervisory conversion with the FHLBB. Mutual Federal's application reproduced precisely the forbearance request in First Commerce's application and included a copy of the same business plan, in both cases requesting the same level yield amortization of the goodwill. First Commerce later filed amended applications, which reproduced the same request for level yield amortization over the lives of the intangible assets.

The FHLBB approved the acquisition, in a letter signed by representatives of the FHLBB's Office of General Counsel and Office of Regulatory Policy, Oversight and Supervision. The approval letter authorized and directed the Secretary of the Board to issue a letter granting Mutual Federal certain supervisory forbearances. The forbearance letter, issued "By the Federal Home Loan Bank Board," granted four specific forbearances. Two are relevant here:

3. For purposes of reporting to the Board, the value of any intangible assets resulting from the application of pushdown accounting in accounting for the purchase, may be amortized by Mutual over a period not to exceed 25 years by the straight line method.

4. Not later [than] 120 days following the date of consummation of the acquisition ..., Mutual shall submit to the Supervisory Agent an opinion of independent certified public accountants that Mutual has accounted for the transaction in accordance with generally accepted accounting principles ("GAAP")

except as herein provided by the Board, for purposes of reporting to the Federal Home Loan Bank Board: (a) the value of any resulting unidentifiable intangible asset may be amortized by Mutual over a period of 25 years by the straight line method.

While First Commerce's application had requested level yield amortization over the lives of the related assets (GAAP treatment), the FHLBB's forbearance letter granted non-GAAP straight line amortization over 25 years—as requested in First Commerce's original bid letter. Thus, while the FHLBB's grant of purchase method accounting treatment for intangible assets [2] mirrored the terms of First Commerce's application, the method and length of amortization did not.

First Commerce consummated its acquisition on July 1, 1988, and changed Mutual Federal's name to "First Commerce Bank, A Federal Savings Bank." The record shows that, consistent with the FHLBB's forbearance No. 4, First Commerce's accountants provided an opinion letter stating that the accounting for the acquisition complied with GAAP, except that goodwill would be amortized "over 25 years by the straight line method for regulatory reporting purposes, as allowed by the FHLBB's forbearance letter dated May 26, 1988." The record before us does not indicate whether this opinion was submitted to the FHLBB's Supervisory Agent as required by the FHLBB's forbearance letter.

The remaining facts follow the common pattern of *Winstar* cases. In 1989, Congress passed FIRREA, imposing more stringent limits on the use of supervisory

---

**2.** The forbearance letter refers to "intangible assets resulting from the application of pushdown accounting ...." For purposes of this case, push-down accounting is equivalent to purchase method accounting.

goodwill to satisfy regulatory capital requirements and mandating more rapid amortization of intangible assets. *See Winstar*, 518 U.S. at 856–58, 116 S.Ct. 2432. Despite the infusion of additional capital by First Commerce's investors, the new thrift failed to meet regulatory capital standards, and was placed in receivership by the Office of Thrift Supervision in 1991.

First Commerce filed suit in 1992, asserting both breach of contract and takings claims against the United States in the amount of $ 2.3 million. Proceedings were stayed pending the outcome of *Winstar*. Following resolution of that case, First Commerce and the government made cross-motions for summary judgment on the issue of liability. The Court of Federal Claims ruled that no contract existed between First Commerce and the government. While the court also considered the economic circumstances of the acquisition and the evidence of negotiations between First Commerce and the FHLBB, the court's holding rested on the discrepancy between First Commerce's request for level yield amortization over the lives of the related assets in its application, and the FHLBB's grant of 25 year straight line amortization in its forbearance letter. The Court of Federal Claims held that this discrepancy precluded a finding that First Commerce had made an offer which the government accepted: "The terms of the third and fourth forbearances on which plaintiff relies for the terms of the government's acceptance simply do not match the language of First Commerce's application to the FHLBB on which plaintiff relies for the terms of its 'offer.'" *First Commerce*, 53 Fed. Cl. at 46. Concluding that no contract existed between First Commerce and the government, the Court of Federal Claims denied summary judgment on liability to First

Commerce and granted it to the United States. First Commerce appeals. We exercise exclusive jurisdiction over an appeal from a final decision of the Court of Federal Claims under 28 U.S.C. § 1295(a)(3).

## II

### A

■■■ Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). We review the grant of summary judgment by the Court of Federal Claims de novo, drawing justifiable factual inferences in favor of the party opposing summary judgment. *Cook v. United States*, 86 F.3d 1095, 1097 (Fed.Cir.1996). When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving reasonable inferences against the party whose motion is under consideration. *McKay v. United States*, 199 F.3d 1376, 1380 (Fed. Cir.1999). Whether a contract exists between a plaintiff and the United States is a mixed question of law and fact. *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir.1990).

### B

■■ Like other *Winstar* plaintiffs, First Commerce claims that it entered into a contract with the United States, in which the government held out the promise of favorable regulatory accounting treatment in exchange for First Commerce assuming the liabilities of the acquired thrift. *See Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1347 (Fed.Cir.2001). The requisite elements of a contract with the government are no different in *Winstar* cases

than in other cases in which a contract with the government is alleged: mutual intent, including an unambiguous offer and acceptance; consideration; and authority on the part of the government representative to bind the government. *Id.* at 1346. The Court of Federal Claims here found failure of mutual intent, due to the mismatch between the alleged offer, contained in First Commerce's formal application submitted to the FHLBB, and the alleged acceptance, contained in the FHLBB's forbearance letter.

■ First Commerce contends that the Court of Federal Claims erred by refusing to consider "all of the contemporaneous documents" in assessing contractual intent, as instructed by this court in *California Federal.* First Commerce argues that the Court of Federal Claims should not have disregarded the bid letter, which proposed 25–year straight line amortization of intangible assets, and the independent accountant's opinion, which stated (as specified by the FHLBB's forbearance letter) that goodwill would be amortized over 25 years by the straight line method. First Commerce further contends that the Court of Federal Claims improperly dismissed as "vague and inconclusive" the affidavit of First Commerce's president, Mr. Howe, which referred to unspecified "incentives" and "various accounting and operating forbearances" held out by the FHLB of Indianapolis to encourage First Commerce to acquire Mutual Federal.[3]

However, as *California Federal* itself should have made clear, our instruction to consider "all of the contemporaneous docu-

ments" was not a license to ignore the ordinary requirements of offer and acceptance. We find lacking in First Commerce's arguments the word *offer,* which of course still retains operative significance in the law of contracts. If First Commerce cannot identify with particularity an offer memorializing the terms that it allegedly proposed to the government, then it cannot argue that the FHLBB's approval or forbearance letter constituted an acceptance. As we recently emphasized in *D & N Bank v. United States,* 331 F.3d 1374 (Fed.Cir. 2003), while the court is not confined to the four corners of a single document to find an offer (or acceptance), "a cloud of evidence that could be consistent with a contract" does not satisfy the plaintiff's burden of proving mutual intent. *Id.* at 1377. Although First Commerce urges us to find mutual intent from the "totality of the circumstances" surrounding First Commerce's intercourse with the government, we agree with the Court of Federal Claims that the evidence cannot support any theory of contract relying on an offer by First Commerce and an acceptance by the FHLBB.

■ First Commerce's reluctance to identify an "offer" leaves us with some uncertainty as to where we should look for the terms of the proposed bargain. But neither the bid letter, nor the formal application, qualifies as an offer for a contract with a 25–year straight line amortization term. We doubt that the bid letter was complete and detailed enough to constitute an offer, or was sufficient to confer upon the government the power to bind First Commerce by an acceptance. But

---

**3.** The question before the Court of Federal Claims was whether the government and First Commerce agreed on contractual terms. Mr. Howe's references to "negotiations" and "incentives" are devoid of specific terms. This

evidence might be relevant to the existence of consideration, but not to the question of mutual assent as framed on summary judgment. The Court of Federal Claims did not err by disregarding these nebulous allegations.

even if considered an offer, the bid letter was superceded and thereby revoked by First Commerce's subsequent formal application, which proposed a different amortization term. *See* E. Allan Farnsworth, *Contracts* § 3.17, at 159 (3d ed.1999) (explaining that subsequent offer inconsistent with original offer may revoke original offer).

 We agree with the Court of Federal Claims that First Commerce's formal application, while definite enough to constitute an offer, could not have been accepted by the FHLBB's forbearance letter, due to the mismatch between First Commerce's request for level yield amortization over the lives of the assets[4] and the FHLBB's grant of 25-year straight line depreciation. Under the traditional "mirror image" rule of the common law, mismatch between offer and acceptance negates contractual liability. *See, e.g., Iselin v. United States,* 271 U.S. 136, 139, 62 Ct.Cl. 766, 46 S.Ct. 458, 70 L.Ed. 872 (1926) ("It is well settled that ... an acceptance upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modification suggested."). First Commerce does not suggest that the traditional rules of contract formation should be disregarded in this context, and we decline to so hold. *See Winstar,* 518 U.S. at 870–71, 116 S.Ct. 2432 (holding that ordinary contract principles govern *Winstar* claims). Accordingly, no binding contract could be formed by the exchange of First Commerce's formal application and the FHLBB's forbearance letter.

## C

 However, although the Court of Federal Claims' analysis of offer and acceptance was correct, that analysis did not go far enough. As First Commerce suggests, the same common law rules that disqualify the FHLBB's forbearance letter as an acceptance lead inexorably to the conclusion that the FHLBB made a counteroffer when it proposed a different amortization term. "A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." *Restatement (Second) of Contracts* § 59 (1979); *see also Buesing v. United States,* 47 Fed. Cl. 621, 632–33 (2000). The FHLBB's forbearance letter, in combination with the approval, expressed assent to the acquisition of Mutual Federal as proposed in First Commerce's application, with a variation in the amortization term. Such a communication qualifies as a counteroffer.

The presence of the forbearance letter distinguishes this case from *D & N Bank,* in which there were no written documents articulating the government's agreement to provide favorable accounting treatment. *D & N Bank,* 331 F.3d at 1378–79. We have previously held that forbearance letters may demonstrate a contractual obligation by the government "to recognize the supervisory goodwill and the amortization periods reflected in the forbearance letters." *Cal. Fed.,* 245 F.3d at 1347; *see also D & N Bank,* 331 F.3d at 1381 (distin-

---

4. First Commerce argues that the request for level yield amortization over the lives of the assets in the application (and the business plan) was a "simple mistake," "likely" or "possibly" clarified in subsequent informal conversations. First Commerce puts forward no evidence to support this contention, which evidence would likely run afoul of the parol evidence rule in any event. We, like the Court of Federal Claims, prefer to rely on the objective and formal manifestations of the parties' communications.

guishing *California Federal* by the absence of written government agreements). We conclude that the written documents in this case express the government's promise to offer favorable accounting treatment, and thereby constitute a counteroffer to First Commerce's application.[5]

■■■ The government, which failed to set forth any substantive reply to First Commerce's counteroffer argument in its brief,[6] contended at oral argument that the FHLBB's forbearance letter could not be a counteroffer because the letter was addressed to Mutual Federal, rather than to First Commerce. Even if we ignore the ample references to First Commerce in the forbearance letter, we cannot ignore the government's brief to this court, which states, "the FHLBB also issued a letter granting *FCC* several standard forbearances ..." (emphasis added). The government is now estopped from adopting a contrary position.

■■■ First Commerce argues that it accepted the FHLBB's counteroffer by conduct, as shown by First Commerce's submission of the requested accountant's opinion certifying 25 year amortization of goodwill, and by the same accounting treatment reported in the FHLBB's first examination of the merged thrift after the acquisition. First Commerce is correct, as a general matter, that counteroffers may be accepted by conduct. *See Union Realty Co. v. Moses*, 984 F.2d 715, 721 n. 6 (6th

Cir.1993); *Buesing*, 47 Fed. Cl. at 633. However, as the Court of Federal Claims' analysis did not proceed past the question of whether the FHLBB had accepted First Commerce's offer, we leave for the court on remand the determination of whether First Commerce accepted the FHLBB's counteroffer.

### III

The United States also re-asserts on appeal several defenses that were raised before the Court of Federal Claims, which the court did not reach in light of its disposition of the case on summary judgment. The United States argues that the government's actions were regulatory rather than contractual; that the signatories of the FHLBB's approval letter (the Office of General Counsel and Office of Regulatory Policy, Oversight and Supervision) lacked delegated authority to contract on behalf of the FHLBB; that the FHLBB itself had statutory authority only to contract with FSLIC-insured institutions (thrifts), not with holding companies such as First Commerce; and that the Regulatory Capital Maintenance Agreement executed between First Commerce and the FSLIC assigned the risk of regulatory change to First Commerce.

■■■ Concerning the government's first defense, in light of our holding that the FHLBB made a counteroffer to First Commerce, we must reject the argument

---

5. We note that treating the FHLBB's forbearance letter as a counteroffer fits the transaction neatly into the mold of a unilateral contract, in which the government promised favorable accounting treatment in exchange for First Commerce's performance of acquiring Mutual Federal.

6. The government also argues that First Commerce did not raise the counteroffer argu-

ment before the Court of Federal Claims. The government appears to be correct. However, we find no indication that the government raised the mirror-image argument until its reply brief in support of summary judgment. It would be inappropriate to truncate the contractual analysis at this point.

that the regulatory nature of the government's actions absolves it from contractual liability. The government surely was acting in its regulatory capacity, but the argument that the government is immune from contractual liability *because* it was acting in its regulatory capacity was rejected squarely by this court and the Supreme Court in *Winstar*. The question in this case, as in other *Winstar* cases, is whether the government, in exchange for First Commerce's agreement to rescue a failing thrift, also made promises that certain regulatory treatment would be extended and maintained: namely, treating supervisory goodwill as regulatory capital and permitting its amortization over an extended period of time. If the elements of contract formation are absent, then the government was acting solely in its regulatory capacity; if a contract was formed, then the government may be liable for its breach. To assert that the government was acting solely in its regulatory capacity is to assert a conclusion about contractual liability, not a premise that negates it. As we held in *D & N Bank*, the supervisory nature of the business transaction is not "probative of the government's intent to contract." *D & N Bank*, at 1380. Nor can the characterization of "regulatory" or "supervisory" absolve the government of its contractual liability if it is shown that the government has indeed bound itself by contract.

The government's remaining defenses raise questions that we decline to address in the first instance on appeal, and we commit their resolution to the Court of Federal Claims on remand as well.

## CONCLUSION

While we cannot fault the Court of Federal Claims' analysis of the alleged offer and acceptance in this transaction, we find that traditional contract law principles compel the conclusion that the FHLBB made a counteroffer to First Commerce's formal proposal to acquire Mutual Federal. Because this counteroffer may have given rise to a binding contract between First Commerce and the United States, we vacate the grant of summary judgment to the United States and the denial of summary judgment to First Commerce, and remand the case to the Court of Federal Claims for further proceedings.

*VACATED AND REMANDED.*