**AMERICAN CAPITAL CORPORATION**
and Transcapital Financial
Corporation, Plaintiffs,

and

**Federal Deposit Insurance Corporation, as Successor to the Rights of the Transohio Savings Bank, Plaintiff–Intervenor,**

v.

The **UNITED STATES**, Defendant.

No. 95–523C.

United States Court of Federal Claims.

Oct. 31, 2003.

See also: 967 F.2d 598.

Charles J. Cooper and Vincent J. Colatriano, Washington, D.C., for plaintiffs.

Andrew Charles Gilbert, Washington, D.C., for plaintiff-intervenor, Federal Deposit Insurance Corporation.

Jane Margaret Ellen Peterson, Washington, D.C., for defendant, United States Department of Justice.

## MEMORANDUM OPINION

BRADEN, Judge.

This case is another progeny of *Winstar Corp. v. United States,* 25 Cl.Ct. 541 (1992) ("*Winstar I*"), *aff'd,* 64 F.3d 1531 (Fed.Cir.

1995) (en banc) (*"Winstar II"*), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*"Winstar III"*). For the reasons discussed herein, the court grants the October 10, 2000 motion for partial summary judgment filed by American Capital Corporation and Transcapital Financial Corporation (collectively "plaintiffs"), in substantial part, because an August 29, 1986 Assistance Agreement between plaintiffs and the Federal Savings and Loan Insurance Corporation ("FSLIC"), incorporating by reference an August 21, 1986 Federal Home Loan Bank Board ("FHLBB") Resolution No. 86–864 ("Assistance Agreement"), created a valid and enforceable contract. That contract was breached by the Office of Thrift Supervision ("OTS"), the successor agency to the FHLBB, at least as early as December 7, 1989 when OTS issued final regulations implementing far more stringent regulatory capital requirements and standards than those set forth in the terms of FHLBB Resolution No. 86–864 and the Assistance Agreement executed in reliance thereof.

### RELEVANT FACTS AND PROCEDURAL BACKGROUND [1]

To date, the United States Court of Appeals for the Federal Circuit has issued twenty-six opinions implementing and interpreting a variety of legal issues in *Winstar*-related cases that chronicle in detail the financial crisis in the savings and loan ("thrift") industry leading to the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (1989). *See, e.g., Anderson v. United States,* 344 F.3d 1343, 1345–47 (Fed.Cir.2003); *Landmark Land Co., Inc. v. United States,* 256 F.3d 1365, 1369–71 (Fed.Cir.2001); *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1376–78 (Fed.Cir.2001). Therefore, knowl-

edge of the history of FIRREA and the teachings of *Winstar* are presumed, so the court will limit the narrative and discussion in this opinion to the facts and controlling law relevant to a resolution of plaintiffs' pending summary judgment motion regarding liability.

### A. The Transohio Merger

On August 29, 1985, FSLIC and FHLBB convened a conference of financial institutions and potential investors to market three financially troubled thrifts, including Citizens Federal Savings and Loan Association of Cleveland, Ohio ("Citizens") and Dollar Savings Bank of Columbus, Ohio ("Dollar"). *See* Pl.App. at 322–35. On October 23, 1985, Transohio Savings Bank, F.S.B. ("Transohio"), a federally chartered stock savings and loan association, insured by FSLIC, submitted a proposal to acquire Citizens and Dollar. *See* Pl.App. at 26–203. Transohio, FSLIC, and FHLBB continued good faith negotiations from October 1985 through July 1986. *See* Burstein Affidavit (Chairman of Transohio; Chairman, President and CEO of Transcapital Financial Corporation; and President and CEO of American Capital Corporation [2]) at ¶ 8 (Pl App. at 3). On August 21, 1986, FHLBB declared Citizens, a federally chartered, FSLIC-insured thrift institution insolvent. *See* Pl.App. at 14–25. On August 21, 1986, FHLBB also declared Dollar, an Ohio chartered, FSLIC-insured mutual savings bank insolvent. *Id.*

On August 21, 1986, FHLBB issued Resolution No. 86–864 conditionally approving a proposed Assistance Agreement between plaintiffs, Transohio, and the Government. *See* Pl.App. at 14–23. The key terms of the Assistance Agreement signed by plaintiffs, Transohio, and FSLIC on August 29, 1986 were: 1) Transohio would merge with Citizens and Dollar to form one entity to be

---

1. The relevant facts recited herein are summarized primarily from the documents found in the Appendices submitted by the parties. Plaintiffs' Appendix and Defendant's Appendix are referred to respectively as Pl.App. and Def.App. In addition, Plaintiffs' October 10, 2000 Motion for Summary Judgment is referred to as Pl. M. Sum. J.; Defendant's December 18, 2000 Opposition is referred to as Def. Opp.; Plaintiff's January 16, 2001 Reply is referred to as Pl. Reply; and

Plaintiff's October 10, 2003 Response to Government's Statute of Limitations Argument is referred to as Pl. Resp.

2. American Capital Corporation ("American Capital") owned the majority of Transcapital Financial Corporation's ("TFC") common stock. Transohio was a wholly owned subsidiary of TFC.

known as Transohio; 2) FSLIC promised to make a $107.5 million cash contribution to the new Transohio; 3) FSLIC agreed to indemnify American Capital, TFC, and Transohio for certain claims and potential losses; 4) FSLIC agreed to purchase approximately $41.5 million of non-performing Citizens assets at book value;[3] 5) Transohio would be allowed to book the $107.5 million in FSLIC assistance as a capital credit[4] to net worth; 6) Transohio would be allowed to amortize intangible asserts, *i.e.*, supervisory goodwill,[5] over a 25 year period using the straight line method;[6] and 7) American Capital and TFC agreed to maintain the net worth of Transohio at regulatory levels and to a "Dividend Limitation Restriction." *See* Pl.App. at 228–292. Transohio ultimately booked more than $50 million in goodwill resulting from the mergers. *See* Pl. M. Sum. J. at 10.

On September 10, 1986, FHLBB also issued a forbearance letter confirming that FSLIC would not foreclose for a five-year period after the Transohio merger for failure to meet net worth requirements. *See* Pl. App. at 293–94.

The terms of the August 21, 1986 FHLBB Resolution 86–864, the Assistance Agreement, the September 10, 1986 forbearance

letter, and the totality of circumstances surrounding the Transohio merger, were typical of scores of other transactions closed in the 1980s where, as the Federal Circuit has explained:

> FSLIC encouraged private investors ... to purchase struggling thrifts so that it would not be necessary to liquidate the thrifts using FSLIC funds to reimburse depositors. The primary inducement that the FSLIC offered potential purchasers was a partial forbearance from regulatory capital requirements. The FSLIC accomplished this by allowing the purchaser to treat the thrift's asset shortfall itself as a fictional asset, so that the thrift's assets and liabilities were placed in equipoise at the time of acquisition-at least on paper. For instance, if a thrift had $80 in assets and $100 in liabilities, the FSLIC would allow the thrift's purchaser to allocate the $20 shortfall in real assets to a fictional asset called "supervisory goodwill." The FSLIC would then allow the thrift to include this supervisory goodwill among the assets used to meet regulatory capital maintenance requirements. Because the regulatory goodwill was amortized over a long period, typically forty years ... the

---

3. "[B]ook value ... is simply the total amount of the capital, which is also the difference between total assets and total liabilities. Book value is important because it serves as a basis for asset revaluations or goodwill recognition." RICHARD E. BAKER, VALDEAN C. LEMBKE, AND THOMAS E. KING, ADVANCED FINANCIAL ACCOUNTING 814 (5th ed. 2002) ("ADVANCED FINANCIAL ACCOUNTING").

4. "[A] further inducement, described as a 'capital credit' ... arose when FSLIC itself contributed cash to further a supervisory merger and permitted the acquiring institution to count the FSLIC contribution as a permanent credit to regulatory capital. By failing to require the thrift to subtract this FSLIC contribution from the amount of supervisory goodwill generated by the merger, regulators effectively permitted double counting of the cash as both a tangible and intangible asset. Capital credits thus inflated the acquiring thrift's regulatory capital and permitted leveraging of more and more loans." *Winstar III*, 518 U.S. at 853, 116 S.Ct. 2432 (citations omitted).

5. Goodwill is "an intangible asset ... the excess of cost over the fair value of the identifiable net assets acquired." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1039 (Fed.Cir.2003) (en

banc); *see also* ADVANCED FINANCIAL ACCOUNTING at 12 ("Each identifiable asset and liability acquired is valued at its fair value at the date [of acquisition]. Any amount of the purchase price in excess of the fair value of the identifiable assets and liabilities acquired is viewed as the price paid for goodwill."). *See Winstar III*, 518 U.S. at 849, 116 S.Ct. 2432 ("Goodwill recognized under the purchase method as the result of an FSLIC-sponsored supervisory merger was generally referred to as 'supervisory goodwill.' Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case.") (footnotes omitted).

6. The straight-line method is "appropriate when the asset use is expected to be relatively even over its estimated useful life or there is no discernible pattern of decline in service potential." JAN R. WILLIAMS, 2002 GAAP GUIDE· RESTATEMENT AND ANALYSIS OF CURRENT FASB STANDARDS 12.08 (2002) ("2002 GAAP GUIDE"). According to the GAAP GUIDE at 12.08, the straight-line method of depreciation is determined by the following formula:

$$\frac{\text{Cost less salvage value}}{\text{Estimated useful life in years}}$$

thrift's purchaser would have to contribute much less in actual capital to the thrift. This made the thrift far more attractive to potential purchasers, at no cost to the FSLIC.

*Landmark,* 256 F.3d at 1370.

On November 26, 1986, Transohio submitted a report to FHLBB describing the intangible assets, including supervisory goodwill, that were being carried on Transohio's books in reliance on the terms of the Assistance Agreement. *See* Pl.App. at 295–97. At that time, Transohio also provided FHLBB with an opinion letter by Peat Marwick, Transohio's certified public accounting firm, concluding that the August 29, 1986 merger complied with "generally accepted accounting principles." *See* Pl.App. at 298–99.

On April 20, 1987, however, FHLBB advised Transohio that it should "amend ... [its] financial reports for the September and December 1986 quarterly periods and for all monthly periods affected." *See* Def.App. at 36. Transohio disputed FHLBB's interpretation of whether and how Transohio could amortize its newly acquired supervisory goodwill (*id.* at 37–42), without success. On June 17, 1987, FHLBB then *directed* Transohio to amend all monthly and quarterly reports filed since August 1986:

> TRANSOHIO *must* account for goodwill using GAAP except to the extent that departures from GAAP were authorized by the Bank Board. None of the departures from GAAP authorized in Bank Board Resolution No. 86–864 change the GAAP requirement that the amortization of goodwill must be charged to expense. Therefore, we *specifically direct* that you file amended monthly and quarterly financial reports as soon as possible.

Def.App. at 44. (emphasis added).

## B. The Enactment of FIRREA and Its Adverse Impact on Transohio and Plaintiffs

By the end of the 1980s, it became painfully apparent that the nation's thrift institutions were not capitalized adequately and needed to be subject to the same regulatory standards as national banks. To accomplish these objectives, on August 9, 1989, Congress enacted FIRREA, a broad-ranging statute that reorganized and empowered relevant federal supervisory and enforcement authorities and imposed new and far more stringent capital requirements and standards on thrifts. In short, FIRREA abolished FSLIC; created a new thrift deposit insurance fund to be managed by the Federal Deposit Insurance Corporation ("FDIC"); transferred FHLBB powers to the Office of Thrift Supervision ("OTS"), which was made responsible for regulating all federally insured savings institutions; and established the Resolution Trust Corporation ("RTC") to liquidate or dispose of failed thrifts and their assets. *See Winstar III,* 518 U.S. at 856, 116 S.Ct. 2432. For example, FIRREA required OTS to " 'prescribe and maintain uniformly applicable capital standards for savings associations,' in accord with strict statutory requirements." *Id.* (quoting 12 U.S.C. § 1464(t)(1)(A)). FIRREA also required thrifts to comply with new "core capital, tangible capital, and risk-based capital requirements." *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1352 (Fed.Cir. 2001). Significantly, thrifts now had to maintain core capital (by definition excluding unidentifiable intangible assets such as supervisory goodwill) in an amount not less than three percent of the savings association's total assets. *See* 12 U.S.C. § 1464(t)(2)(A). Initially, FIRREA allowed thrifts to count "qualifying supervisory goodwill" toward half of the core capital requirements, but this transitional accommodation was phased out by 1995. *See* 12 U.S.C. § 1464(t)(3)(A); *see also Winstar III,* 518 U.S. at 856–57, 116 S.Ct. 2432. In addition, tangible capital was required to be maintained in an amount not less than 1.5 percent of the savings association's total assets, defined to exclude supervisory and other forms of "goodwill." *See* 12 U.S.C. § 1464(t)(2)(B).

On September 30, 1989, Transohio recorded regulatory capital of $284.4 million on its books, of which $94.2 million was attributed to a portion of FSLIC's $107.5 million capital contribution. *See* Burstein Affidavit at ¶ 20 (Pl.App. at 8). The $13.3 million difference already had been amortized by Transohio. *Id.* On December 7, 1989, FIRREA became

effective, and thereafter OTS no longer allowed Transohio to utilize its unamortized capital credit to comply with core and risk-based capital requirements. *Id.* at ¶ 21. Transohio also was prohibited from using its supervisory "goodwill" to meet FIRREA's regulatory requirements. *Id.*

On January 18, 1991, OTS notified Transohio of its intent to impose an Individual Minimum Capital Requirement ("IMCR") on that institution. *See Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 1991 WL 201178, *4 (D.D.C.1991) ("Transohio I"). Transohio filed extensive comments in response. Nevertheless, on May 7, 1991, the OTS imposed an IMCR on Transohio requiring it to increase its tangible capital by the greater of $100 million or by an amount that would increase its tangible capital level to 4.5 percent of tangible assets. *See* Def.App. at 59–65. On May 23, 1991, OTS issued a final notice. *See Transohio I,* at *4. Again, Transohio objected to no avail. *Id.* On July 10, 1992, OTS issued an order and seized Transohio and its assets.

## C. Related Preliminary Injunction Proceedings in the United States District Court for the District of Columbia

On August 1, 1991, Transohio sued OTS in the United States District Court for the District of Columbia ("the district court"), seeking a preliminary Injunction: "(1) to block the [OTS] from taking actions that would impose an individual minimum capital requirement ...; and (2) to require OTS to attribute approximately $110 million in 'supervisory goodwill' as part of Transohio's regulatory capital." *Transohio I,* at *1. The district court, however, found that "Congress sought to preclude judicial review of the process by which OTS sets appropriate capital levels and, in any event, committed the process to the agency's discretion." *Id.* at *7. Accordingly, the district court declined to decide "whether the Assistance Agreement constitutes a contract or some less binding form of agreement.... The legislative history of [FIRREA] confirms beyond any doubt that Congress intended to abrogate capital forbearances such as Transohio's." *Id.* at *7–8. The district court further concluded

that "[e]ven if there were a breach of contract or an unconstitutional taking, plaintiffs would not be entitled to the injunctive relief sought because the sole available remedy for such claims is damages." *Id.* at *9; *see also Sharp v. Weinberger,* 798 F.2d 1521, 1523 (D.C.Cir.1986) (Scalia, J.) ("The sole remedy for an alleged breach of contract by the federal government is a claim for money damages[.]"). Accordingly, the district court held, even if Transohio had a contract with the Government, "there has been no explicit waiver of the sovereign's authority to respond to threats to the nation's economy." *Transohio I,* at *9. For these principal reasons, the district court held that Transohio failed to demonstrate that "any breach, or impending breach, of the alleged contract is violative of the Constitution and should be remedied by an injunction. Plaintiffs have not identified any legally cognizable Fifth Amendment property right. Even if plaintiffs possessed a property interest, the agreement, as discussed, does not extend to Congress." *Id.* Transohio appealed to the United States Court of Appeals for the District of Columbia ("D.C.Circuit").

## D. Related Proceedings in the United States Court of Appeals for the District of Columbia Circuit

On June 12, 1992, the D.C. Circuit affirmed the district court's decision that "Transohio's agreement with FSLIC and the Bank Board ... may have barred the banking regulators from applying different capital accounting rules to Transohio ... [however, it] did not prevent Congress from establishing new capital accounting rules and ordering federal agencies to enforce them." *Transohio Sav. Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 601 (D.C.Cir. 1992) ("Transohio II"). In addition, the D.C. Circuit held that the Administrative Procedure Act (*see* 5 U.S.C. § 702), waived sovereign immunity for Transohio's due process and statutory claims against OTS and that the district court properly exercised jurisdiction over those portions of Transohio's lawsuit. *Id.* at 607. Notably, the D.C. Circuit further held that the "district court did not have jurisdiction over Transohio's pure contract claims because only the Tucker Act, 28

U.S.C. § 1491(a)(1), waives sovereign immunity for Transohio's contract claims, and the Tucker Act provides for jurisdiction in the Claims Court alone." *Id.* at 601. Accordingly, Transohio's common-law contract claims were remanded to the district court with instructions to dismiss it for lack of jurisdiction. *Id.* at 624.

On July 10, 1992, OTS seized Transohio and its assets. It was not until August 3, 1995, following additional proceedings in the district court and in the D.C. Circuit that Transohio's 1991 case finally was dismissed. *See Transcapital Fin. Corp. v. Director, OTS,* No. 93–5260 (D.D.C. Aug. 3, 1995).

**E. Proceedings in the United States Court of Federal Claims**

On August 8, 1995, plaintiffs filed an action in this court asserting both breach of contract and takings claims. On October 10, 2000, plaintiffs filed a motion for partial summary judgment regarding the Government's alleged breach of two specific promises: "(1) to record [the approximately $50 million in supervisory] goodwill created by the transaction as an intangible, amortizing asset, and to count the goodwill toward compliance with Transohio regulatory capital requirements; and (2) to record, as a direct credit to Transohio's regulatory capital, a $107.5 million cash contribution made by [FSLIC] in order to partially offset the massive net worth deficit of the failing thrifts that Plaintiffs acquired." Pl. M. Sum. J. at 2.

On December 18, 2000, the United States, as defendant ("the Government"), responded that any claim "related to the supposed 'permanence' of the direct cash assistance would have accrued in 1987 when it became clear the regulators were requiring proper amortization of this element of the FSLIC assistance." Def. Opp. at 8–9. In addition, the Government argued that OTS's establishment of an IMCR, imposing a 4.5 percent tangible capital level, was not a breach of contract but a monitoring of the "safety and soundness of a thrift." *Id.* at 9.

On August 15, 2003, former Chief Judge Loren Smith transferred this case to the undersigned judge. On October 3, 2003, the court ordered plaintiffs to address the statute of limitations argument, initially raised in the Government's December 18, 2000 Opposition, but to which plaintiffs never directly responded. *See* Pl. Reply. On October 10, 2003, plaintiffs acknowledged that the Federal Circuit's recent decision in *Coast Federal Bank v. United States,* 323 F.3d 1035 (Fed. Cir.2003) (en banc), holding that supervisory goodwill was required to be amortized, governed the substance of a similar claim asserted by plaintiffs in this case. *See* Pl. Resp. at 5. Accordingly, plaintiffs abandoned their amortization claim to which the statute of limitations defense would have applied. *Id.* With this matter clarified and resolved, the court now proceeds to determine whether the Assistance Agreement was a valid and enforceable contract and whether the OTS breached any terms thereof.

**DISCUSSION**

**A. Jurisdiction**

■ The United States Court of Federal Claims is authorized under the Tucker Act, 28 U.S.C. § 1491(a)(1)(2000), to render judgment and money damages on any claim against the United States founded on the United States Constitution, any act of Congress, any regulation of an executive department, or an express or implied contract with the United States. *See United States v. Testan,* 424 U.S. 392, 397–398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). The United States Supreme Court, however, has clarified that the Tucker Act does not create any substantive right for monetary damages. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Therefore, to maintain standing in this court, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and or executive agency regulation that provides a substantive right to money damages. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000). In this case, plaintiffs properly have plead a claim for breach of contract. *See, e.g., Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997); *Gould, Inc. v. United States,* 67 F.3d 925, 929 (Fed.Cir. 1995).

## B. Standard of Review

If there is no genuine issue as to any material fact, the moving party is entitled to summary judgment as a matter of law. *See* RCFC 56(c); *see also Winstar II,* 64 F.3d at 1539 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine only if it might prompt a reasonable fact-finder to resolve a factual matter in favor of the non-moving party. *See Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). A material fact is one that is considered relevant under applicable law. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. The existence, however, of *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, where the non-moving party only proffers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## C. Summary Judgment

The initial question before the court on partial summary judgment in this case is whether OTS, in exchange for plaintiffs' agreement to rescue two failing thrifts, breached contractual promises made by FHLBB and FSLIC regarding how Transohio would be allowed to meet its regulatory capital requirements. *See First Commerce Corp. v. U.S.,* 335 F.3d 1373, 1383 (Fed.Cir. 2003).

### 1. Collateral Estoppel Considerations

 Under the doctrine of collateral estoppel "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a differ-

ent claim." RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982); *see also Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (holding that collateral estoppel precludes "parties from contesting matters that they have had a full and fair opportunity to litigate[,] protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.");[7] *Banner v. United States,* 238 F.3d 1348, 1354–55 (Fed.Cir. 2001).

Although the district court declined to consider whether plaintiffs entered into a contractual relationship, the D.C. Circuit held as a matter of law that the Assistance Agreement, incorporating FHLBB Resolution 86–864, was indeed a "contract, according to the plain language ... moreover, ... the circumstances of the mergers support a finding that the transaction reflected a voluntary bargain, the terms of which were freely negotiated by the parties and binding on them." *Transohio II,* 967 F.2d at 618. Accordingly, the court sees no reason to disturb the finality of the D.C. Circuit's 1992 determination that FSLIC and FHLBB made contractual promises to plaintiffs on which they had a right to rely. *Assuming arguendo* that collateral estoppel is determined not to apply in this case, as discussed below, the court independently has determined that all the requisite elements of contract formation have been satisfied in this case.

### 2. Plaintiffs' Contract With The United States

 Whether a contract exists is a mixed question of law and fact. *See, e.g., Castle v. United States,* 301 F.3d 1328, 1337 (Fed.Cir.2002); *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998); *Ransom v. United States,* 900 F.2d 242, 244

---

7. The D.C. Circuit did not consider issuance of the FHLBB forbearance letter relevant or necessary to ascertain the terms of the contractual relationship. *See Transohio II,* 967 F.2d at 618. The Federal Circuit, however, has held that under certain circumstances "forbearance letters may demonstrate a contractual obligation by the government 'to recognize the supervisory good-

will and the amortization periods reflected in the forbearance letters.' " *First Commerce,* 335 F.3d at 1381 (quoting *Cal. Fed.,* 245 F.3d at 1347). Since the court has held that the Assistance Agreement, incorporating FHLBB Resolution 86–864, constitutes the entirety of the contract, the legal effect of the forbearance letter need not be determined here.

(Fed.Cir.1990). When one of the parties to an agreement is the United States, four requirements must be met to establish a contract: (1) mutuality of intent; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) actual authority of a representative to bind the government. *See California Fed. Bank, FSB v. United States,* 245 F.3d 1342, 1346 (Fed.Cir.2001). These requisites "are no different in *Winstar* cases[.]" *First Commerce,* 335 F.3d at 1379.[8]

### a) Mutual Intent to Contract

■ Mutuality of intent must be established by an objective manifestation of a voluntary and reciprocal acceptance. *See Anderson,* 344 F.3d at 1353 ("To satisfy its burden to prove ... mutuality of intent, a plaintiff must show, by objective evidence, the existence of an offer and a reciprocal acceptance."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981) ("RESTATEMENT"). Mutuality of intent usually "takes the form of an offer or proposal by one party followed by acceptance by the other party or parties." RESTATEMENT at § 22(1).

On August 21, 1986, FHLBB issued Resolution 86–864, which refers to the proposed Assistance Agreement between Transohio, TFC, and American Capital Corporation (Pl. App. at 14) and later, in relevant part, provides:

> RESOLVED FURTHER, That, in accounting for the mergers of Citizens and Dollar with and into Transohio, Transohio shall use generally accepted accounting principles prevailing in the savings and loan industry, as accepted, modified, clarified, or interpreted by applicable regulations of the Bank Board and the FSLIC,

except to the extent of any or all of the following departures from GAAP:

> (a) Push-down accounting shall be used to reflect the Citizens and Dollar Mergers on the books of Transohio;
>
> (b) The cash contribution by the FSLIC to Transohio, pursuant to the Assistance Agreement, may be deemed a contribution to net worth and may be booked a direct credit to Transohio's net worth;
>
> (c) The value of any intangible assets resulting from the Citizens and Dollar Mergers shall be amortized by Transohio over a period of 25 years by the straight line method[.]

Pl.App. at 21–22.

■ The court finds that FHLBB Resolution 86–864 constituted a *bona fide* offer, although it was contingent upon the issuance of an opinion representing that the mergers in fact were consummated pursuant to the terms of the Assistance Agreement and applicable law. *See* Pl.App. at 14, 17–18.

The acceptance of an offer may be manifested by "assent to the terms thereof made by the offeree in a manner invited or required by the offer." RESTATEMENT at § 50(1); *see also Anderson,* 344 F.3d at 1353. Here, acceptance of the terms of FHLBB Resolution 86–864 is evidenced by the execution of the August 29, 1986 Assistance Agreement, which specifically incorporated "any resolution or action of the BANK BOARD approving, or adopted concurrently with, this Agreement[.]" Pl.App. at 272. *See Cal. Fed.,* 245 F.3d at 1346–47 (acknowledging that multiple related documents, when read together, can evidence an intent to contract). Accordingly, the court finds that mutuality of

---

8. To date, the Federal Circuit has discussed the requirements to establish a breach of contract in five *Winstar*-related cases. *See, e.g., Anderson,* 344 F.3d at 1353–58 (affirming that no binding contractual term was breached by FIRREA, since a FHLBB resolution and forbearance letter alone did not manifest assent to the goodwill amortization term of an offer); *First Commerce,* 335 F.3d at 1379–82 (remanding to determine whether the government's counteroffer was accepted); *D & N Bank v. United States,* 331 F.3d 1374, 1378–82 (Fed.Cir.2003) (affirming that no contract exists when there were no explicit documents evidenc-

ing the government's intent to be bound; the existence of a FHLBB Resolution alone reflecting "mere approval" of a merger does not amount to an intent to contract.); *Castle,* 301 F.3d at 1339–41 (declining to reach the issue of whether summary judgment as to contractual liability was properly granted); *Bluebonnet Sav. Bank,* 266 F.3d at 1354–56 (affirming contractual liability determination where an Assistance Agreement, Capital Maintenance Agreement, ten-year capital forbearance, and dividend forbearance were breached).

intent to contract has been established in this case.

### b) Lack of Ambiguity in Offer and Acceptance

The Federal Circuit requires that the material terms of an agreement must be definite before a contract may be established. *See Modern Sys. Tech. Corp. v. United States,* 979 F.2d 200, 202 (Fed.Cir.1992) ("In the absence of . . . sufficiently definite terms, no contractual obligations arise."). Certainty serves two purposes: first, to evidence that parties intended to contract; and second, to assist the court in determining whether a breach has occurred. *See Aviation Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1572 (Fed.Cir.1991); *see also* RESTATEMENT at § 33. The court finds that the Assistance Agreement, FHLBB Resolution 86–864, and the terms thereof were clear and definite, particularly with regard to promises regarding plaintiffs' ability to utilize both the capital credit resulting from FSLIC's $107.5 million cash contribution at the time of the Transohio merger and supervisory goodwill to meet its regulatory capital requirements.

### c) Consideration

Transohio assumed the liabilities of Citizens and Dollar through a supervisory merger that plaintiffs contend saved the government approximately $57.7 million. *See Transohio I,* at *2. In exchange, FSLIC contributed $107.5 million in cash and purchased certain assets at book value, but as the D.C. Circuit noted, "[T]he fact that they gave Transohio money does not mean that money is all they gave it. . . . We think the documents strongly suggest that, in addition to money, the agencies gave Transohio some ability to count as regulatory capital the intangible assets created by the mergers. . . . the documents indicate that the agencies promised they would allow Transohio to include goodwill [as capital.]" *Transohio II,* 967 F.2d at 618. *See also First Commerce,* 335 F.3d at 1377 n. 1 ("Permitting the use of supervisory goodwill to satisfy minimum capital requirements, and allowing the merged thrifts to amortize supervisory goodwill over extended periods, were typically the induce-

ments offered by the government to persuade healthy institutions to assume the liabilities of troubled thrifts."); *Winstar II,* 64 F.3d at 1542 ("If the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use."); *Winstar III,* 518 U.S. at 853, 116 S.Ct. 2432 ("[T]he accounting treatment to be accorded supervisory goodwill and capital credits was the subject of express arrangements between the regulators and the acquiring institutions."). In addition, the D.C. Circuit found that the FHLBB Resolution specifically allowed that "[t]he [$107.5 million] cash contribution by the FSLIC . . . may be deemed [by Transohio as] a contribution to net worth and may be booked as a direct credit to Transohio's net worth." *Transohio II,* 967 F.2d at 617 (quoting Bank Board Resolution 86–864 at 8); *see also* Pl.App. at 21. Accordingly, the court also determines there is ample evidence of consideration in this record.

### d) Authority to Bind the Government

Finally, the court is satisfied that Mr. Jeff Sconyers, the Secretary of the Federal Home Loan Bank Board, who signed FHLBB Resolution 86–864 (Pl.App. at 23), and Mr. Thurman C. Connell, Director of the Federal Savings and Loan Insurance Corporation, were representatives of the United States with authority to bind the Government. *See Winstar III,* 518 U.S. at 890, 116 S.Ct. 2432 ("[T]he Bank Board and FSLIC had ample statutory authority to . . . promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible.").

### 3. OTS's Breach

With respect to contract interpretation, it is well settled that if the language is clear and unambiguous, the terms are to be given their plain and ordinary meaning. *See Coast Fed. Bank,* 323 F.3d at 1040–41 ("When the contractual language is unambiguous on its face, our inquiry ends and the plain language of the [a]greement controls."). The Federal Circuit requires the

court to review the totality of events and circumstances in determining whether there has been a material breach of contract. *See Stone Forest Indus., Inc. v. United States,* 973 F.2d 1548, 1552 (Fed.Cir.1992) (citing Restatement § 241). Among the factors to be considered include the nature and effect of the breach in light of how the contract was viewed, bargained for, entered into, and performed. *Id.* at 1551.

 The record in this case is clear that, but for FSLIC's $107.5 million capital credit and promise that such credit would be recognized as an asset in determining Transohio's compliance with regulatory requirements, plaintiffs and Transohio would not have entered into the Assistance Agreement. *See, e.g.,* Burstein Affidavit at ¶¶ 8–14 (Pl.App. at 3–6); Pl.App. at 14–25; 26–203; 207; 211; 212; 228–285; 293–294. Likewise, but for the FHLBB and FSLIC's agreement to allow Transohio to count amortized supervisory goodwill for the same purpose, plaintiffs and Transohio would not have entered into the Assistance Agreement. *See, e.g.,* Burstein Affidavit at ¶¶ 8–14 (Pl.App. at 3–6); Pl.App. at 14–25; 26–203; 211; 228–285; 293–294; 295. Therefore, the enactment of FIRREA and implementation thereof by OTS breached these promises and deprived plaintiffs and Transohio of the full benefit of their contractual bargain. Moreover, since the capital credit and supervisory goodwill at issue were substantial in amount and essential to Transohio's achieving and maintaining regulatory compliance, imposition of the IMCR by OTS abrogated the entire value of the Assistance Agreement giving rise, not only a material breach but, in fact, a total breach thereof, for which plaintiffs have claimed and now may attempt to prove damages. *See Mobil Oil Exploration & Producing Southeast, Inc. v. United States,* 530 U.S. 604, 608, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (quoting Restatement § 243) ("a breach by non-performance gives rise to a claim for total breach only if it so substantially impairs the value of the contract to the injured party at the time of breach that it is just in the circumstances to allow... [the recovery of] damages based on all ... remaining rights to performance.").

## CONCLUSION

On October 10, 2003, plaintiffs withdrew their claim that supervisory goodwill was not required under the terms of the Assistance Agreement to be amortized. Therefore, that claim is now dismissed as moot. And, since there is no just cause for further delay, plaintiffs' October 10, 2000 motion for partial summary judgment is **GRANTED**, as amended on October 10, 2003. The Clerk of the Court is hereby ordered to enter judgment in accordance with this memorandum opinion.

**IT IS SO ORDERED.**